751 F.2d 277
 Fed. Sec. L. Rep. P 91,930, 17 Fed. R. Evid. Serv. 240
PRITCHARD-KEANG NAM CORP., Delaware, et al., Appellees,
v.
Leon JAWORSKI, et al., Appellants.
PRITCHARD-KEANG NAM CORP., Delaware, et al., Appellees,
v.
INTERNATIONAL SYSTEMS & CONTROLS CORPORATION, Appellant.
 Nos. 84-1444, 84-1445.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 15, 1984.
Decided Dec. 28, 1984.
Rehearing and Rehearing En Banc Denied Jan. 30, 1985.
 
 Thomas M. Bradshaw, Hoskins, King, McGannon, Hahn & Hurwitz, Kansas City, Mo., V. Thomas Lankford, Jr., Carol L. Chomsky, Sharp, Green & Lankford, Washington, D.C., for appellant International Systems.
 Thomas E. Deacy, Jr., Phillip B. Grubaugh, Deacy & Deacy, Kansas City, Mo., for appellants Fulbright & Jaworski.
 Joseph J. Kelly, Jr., Jerome T. Wolf, Mark A. Thornhill, Kansas City, Mo., for Pritchard-Keang Nam Corp.; Spencer, Fane, Britt & Browne, Kansas City, Mo., of counsel.
 Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and HANSON,* Senior District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The issue before us is whether the crime-fraud exception to the attorney-client privilege applies to a report prepared by the law firm of Watson, Ess, Marshall & Enggas for International Systems & Controls Corporation. The district court ruled that it did and certified its order under 28 U.S.C. Sec. 1292(b) (1982). We conclude that the district court abused its discretion in stripping the report of its privilege, and we reverse.
 
 
 2
 ISC is a transnational corporation that provided engineering and construction services through numerous subsidiaries. On May 24, 1976, its board of directors appointed a special audit committee to investigate allegations that ISC had improperly made payments or bribes to persons in or dealing with foreign governments. This step was taken apparently in response to inquiries to ISC from the Securities and Exchange Commission in March 1976. The audit committee was authorized to retain Arthur Young & Co., ISC's regular independent auditors, and the Kansas City law firm of Watson, Ess, Marshall & Enggas, as special independent counsel, to investigate "questionable" or "sensitive" payments to foreign agents. The sensitive payments problem was raised publicly in a Form 10-K annual report filed for the fiscal year ending June 30, 1977. The report explained that a special audit committee was investigating whether illegal, improper, or questionable payments had been made during the years 1970 to 1976. Noting that the investigation was incomplete, the annual report stated that sensitive payments may have been involved in dealings of certain ISC subsidiaries. Following its eighteen-month investigation, Watson, Ess submitted a draft report to the audit committee in December 1977. No "final" report was ever submitted. The committee reported receipt of the Watson, Ess findings to the ISC board on December 28, 1977. Following the recommendation of the audit committee, the board agreed to make the report available to ISC's general counsel, Fulbright & Jaworski. A copy of the report was sent to each of two Fulbright attorneys. The report was discussed further at a board meeting on January 14, 1978.
 
 
 3
 One month later, the SEC served a subpoena on ISC, seeking production of the Watson, Ess report and the data upon which the report was based. The subpoena was resisted on attorney-client privilege grounds. The disposition of this dispute has not been made clear. On April 4, 1978, ISC filed a Form 8-K Current Report with the SEC that contained a substantial discussion of the sensitive payments problem. The report was prepared by Charles Reed, an attorney with the Washington, D.C. firm of Surrey, Karasik & Morse. Among other things, it disclosed that the SEC was conducting a private investigation of the matters covered by the 8-K, which included certain conclusions contained in the Watson, Ess report.[1]
 
 
 4
 During the summer of 1978, ISC commenced negotiations with Keang Nam Enterprises for the sale of two ISC subsidiaries, J.F. Pritchard & Co. and Pritchard International Corp. These two companies provided construction and engineering services on a global scale. Fulbright represented ISC and its subsidiaries, and Keang Nam was represented primarily by Norbert Schlei, an attorney with Hughes, Hubbard & Reed. ISC Senior Vice President Herman Frietsch also played a principal role. The transaction involved the transfer of J.F. Pritchard's and Pritchard International's assets to a Keang Nam subsidiary. Included in J.F. Pritchard's assets was an account receivable from Sonatrach, the Algerian national oil company. Valued at roughly $7.8 million, the receivable had arisen from Pritchard's construction of a natural-gas processing plant at Hassi R'Mel, Algeria. As part of the agreement, ISC represented that the Hassi R'Mel receivable was collectible in full.
 
 
 5
 The transaction was closed on October 20, 1978. As provided by the agreement, ISC secured for Keang Nam the following opinion from Fulbright:
 
 
 6
 To the best of our knowledge, except as disclosed in Schedule 5.6.1 to the Agreement and Exhibit A attached hereto, there is no litigation, proceeding or governmental investigation pending or threatened against or relating to the properties or business of the Seller [J.F. Pritchard & Co.] or PIC, or the transactions contemplated by the Agreement and the Amendment.[2]
 
 
 7
 On July 9, 1979, the SEC filed a lawsuit charging ISC and its officers with numerous violations of the federal securities laws. Many of the violations alleged arose out of questionable and illicit payments in connection with foreign operations. The SEC alleged, among other things, that in 1975 J.F. Pritchard paid approximately $400,000 to a former Algerian military officer for "purported 'consulting services' " on the Hassi R'Mel project. In addition, the complaint described a $1.1 million payment to an Arab agent in connection with the same project. When the Hassi R'Mel contract was executed, in February 1975, Algerian law proscribed payments to government officials and the use of intermediaries in bidding and negotiating Algerian government contracts.
 
 
 8
 In January 1980, ISC filed a Form 8-K Current Report with the SEC. The report was submitted as part of an agreement between the SEC and ISC settling the July 9 lawsuit. ISC admitted that several million dollars had been paid to foreign individuals connected with the Hassi R'Mel project. The company maintained, however, that the payments did not violate Algerian law.
 
 
 9
 Keang Nam commenced this diversity action in December 1981. It alleged that the publicity surrounding the Algerian payments had made the Hassi R'Mel receivable worthless. Apparently, the government of Algeria refused to honor the debt when it realized the extent of the payments made. Pleading that ISC is insolvent, Keang Nam seeks to recoup its losses on the Hassi R'Mel receivable from Fulbright. Keang Nam alleges that Fulbright was negligent in rendering the opinion letter of October 20, 1978. It contends that Fulbright knew or should have known of the potential for investigation and litigation surrounding Hassi R'Mel and that the opinion letter was false.
 
 
 10
 Keang Nam sought production of the Watson, Ess report, and Fulbright raised the claim of attorney-client privilege. ISC was allowed to intervene for the purpose of defending against disclosure. The district court found that the report was protected by the attorney-client privilege and that ISC had not waived the privilege by delivering the report to the SEC in 1978. In analyzing the crime-fraud exception, the court held that whether ISC perpetrated a fraud on Keang Nam through Fulbright turned "on the knowledge held by ISC personnel when the opinion letter was delivered. * * * If ISC knew the opinion letter was inconsistent with facts contained in the Report, then they perpetrated a fraud on plaintiffs. Consequently the Report would be stripped of its attorney-client privilege." Pritchard-Keang Nam Corp. v. Jaworski, No. 81-1034-CV-W-4, slip op. at 5-6 (W.D.Mo. Sept. 26, 1983). The court ordered that discovery be conducted concerning this issue. At the conclusion of this discovery on November 8, 1983, the court issued an order requiring production of the report for in camera review.
 
 On March 9, 1984, the court concluded:
 
 11
 After careful review of the Watson Ess Report, the Court is of the opinion that ISC had sufficient knowledge that the opinion letter issued by Fulbright & Jaworski would be misleading on the issue of whether certain actions by ISC employees or its subsidiaries violated certain ordinances in foreign countries, specific contract terms and affidavits required by certain governmental agencies. ISC had sufficient knowledge that the opinion letter was inconsistent with the facts contained in the Watson Ess Report. Consequently, pursuant to this Court's order entered September 26, 1983, the Watson Ess Report is stripped of its attorney-client privilege and should be subject to a motion to compel discovery by the plaintiffs.
 
 
 12
 Pritchard-Keang Nam Corp. v. Jaworski, No. 81-1034-CV-W-4, slip op. at 1-2 (W.D.Mo. Mar. 9, 1984). Production was stayed until this court could act on an application for appeal.
 
 
 13
 ISC argues that Keang Nam has not made a sufficient showing that ISC retained Fulbright in furtherance of a fraud and has not established a close relationship between the alleged fraud and the Watson, Ess Report. Fulbright argues that ISC's communications to its attorneys were not made in furtherance of a crime or fraud, and that ISC failed to make the requisite prima facie showing of fraud. The application of the crime-fraud exception is committed to the district court's discretion. In re Berkley & Co., 629 F.2d 548, 553 (8th Cir.1980).[3]I.
 
 
 14
 The Watson, Ess report was the subject of two communications: delivery from Watson, Ess to ISC; and delivery from ISC to Fulbright. In considering these communications, the threshold question is choice of law.[4] It is unnecessary, however, to resolve this issue. For purposes of this appeal, the applicable state and federal principles are not materially different. Cf. Crues v. KFC Corp., 729 F.2d 1145, 1148 (8th Cir.1984) (declined to reach choice of law issue regarding submissible case standards where Missouri and federal rules were substantially similar).
 
 
 15
 Missouri has codified the attorney-client privilege. Mo.Rev.Stat. Sec. 491.060(3) (Supp.1983). The statute is simply declaratory of the common law that a person cannot "employ an attorney for the purpose of aiding and abetting him in the commission of a future crime or fraud." Gebhardt v. United Rys., 220 S.W. 677, 679 (Mo.1920); see State v. Faulkner, 175 Mo. 546, 593, 75 S.W. 116, 131-32 (1903). The common law exception is not invoked, however, unless the crime or fraud was contemplated by the client when counsel was employed. Jafarian-Kerman v. Jafarian-Kerman, 424 S.W.2d 333, 338 (Mo.Ct.App.1967) (per curiam); see Faulkner, 175 Mo. at 595, 75 S.W. at 131 (communications "for the purpose of" being guided in the commission of a crime are not privileged).
 
 
 16
 The law in this circuit is that attorney-client communications lose their privileged character when the attorney is consulted "to further a continuing or contemplated criminal or fraudulent scheme." In re Berkley & Co., 629 F.2d 548, 553 (8th Cir.1980) (citations omitted). Disclosure is not appropriate without a "prima facie showing that the legal advice was obtained in furtherance of illegal or fraudulent activity." Id.; see United States v. Horvath, 731 F.2d 557, 561-62 (8th Cir.1984). Timing is critical, for the prima facie showing requires that the "client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme." In re Murphy, 560 F.2d 326, 338 (8th Cir.1977) (citations omitted).
 
 II.
 
 17
 The first communication, from Watson, Ess to ISC, is not within the crime-fraud exception. Arrangements were made for the preparation of the report in 1976. The work was completed by 1977, and presented to the special audit committee in December, 1977. The report was considered by the ISC board of directors on January 14, 1978. Keang Nam pleads that the negotiations for the Pritchard sale commenced in the summer of 1978. Written agreements were signed on July 28, August 25, and October 20. The sale was closed on October 20, 1978. The only claim of fraud surrounds the sale transaction and the representations that there were no sensitive payment problems with respect to the receivables in the contract. There is no indication that at the time of arranging for the Watson, Ess report or at the time the report was forwarded to ISC in December 1977 there was a fraudulent scheme with respect to the sale. The background of the Watson, Ess report supports the conclusion. The minutes of ISC's board meeting of May 24, 1976, and the Watson, Ess letter accepting employment make plain that the investigation was to inform the board of sensitive payments and enable ISC to deal with the SEC investigation. The Watson, Ess Report was not furnished to ISC in furtherance of a fraud, and this communication is privileged.
 
 III.
 
 18
 The next issue is whether the second communication, delivery of the report from ISC to Fulbright, is stripped of the privilege. The district court concluded that ISC had committed a fraud because ISC knew the Fulbright opinion letter was inconsistent with the facts contained in the report. Assuming this conclusion is true, it does not resolve the essential question: was the report communicated with the purpose of perpetrating the fraud? The record requires that we answer this question "no."
 
 
 19
 ISC sent the report to Fulbright in December 1977. The report accompanied a request from the ISC board for legal advice regarding sensitive payments, following a special meeting on December 28, 1977. The meeting was called to discuss the report received from Watson, Ess. Based on the recommendation of the special audit committee, the board of directors decided that the company's general counsel (Fulbright) should be informed on the status of the report. The directors agreed that the report would be made available to Fulbright and the auditors "as they may request to assure appropriate additional legal advice regarding the report." Minutes, ISC Board Meeting, at 3 (Dec. 28, 1977).
 
 
 20
 There is nothing in the record to indicate that when the report was communicated to Fulbright, the sale to Keang Nam had been discussed or that it had reached the negotiation stage. Rather, it appears that the sale was not contemplated until several months later. The first communication from ISC to Fulbright that was arguably in furtherance of a fraud was the request for the opinion letter. This request was not made until long after the report had been communicated. We conclude, therefore, that the report was not communicated for the purpose of furthering a crime or fraud by Fulbright or ISC.
 
 
 21
 Our conclusion is supported by In re International Systems & Controls Corp. Securities Litigation, 693 F.2d 1235 (5th Cir.1982), which involved a shareholder derivative action against the ISC board. The plaintiff alleged that the board either knowingly caused or negligently failed to uncover sensitive payments, and sought production of work papers that Arthur Young had compiled in completing the investigation authorized by the special audit committee. In determining whether the crime-fraud exception to the work-product privilege applied, the court observed that the company's delayed disclosure of the payments arguably constituted fraud. Conceding that the work papers had a reasonable relation to the fraud, the court refused to allow production unless the plaintiffs showed that ISC commissioned the special review with specific intent to commit a fraud. Id. at 1242-43. In this case, a different type of fraud is alleged. This distinction does not, however, make the Fifth Circuit's analysis inapposite. Pritchard has failed to show that ISC intended to commit a fraud when it delivered the report to Fulbright. Therefore, the crime-fraud exception does not apply.
 
 
 22
 Keang Nam argues that even if the report was not communicated to Fulbright in furtherance of a fraud, it should be discoverable because it was ultimately used by ISC to commit a fraud. This is beyond the scope of the crime-fraud exception as we read the precedents in this circuit. See section I supra.[5] Even if we were prepared to recognize this argument, it would not support discovery in this case. That the report may help prove that a fraud occurred does not mean that it was used in perpetrating the fraud.
 
 
 23
 The district court properly articulated the principles of Murphy and Berkley: that the prima facie case requires a showing that the legal advice was obtained in furtherance of the fraudulent activity and was closely related to it. The court then focused, however, on whether there had been a fraud perpetrated because ISC, specifically Herman Frietsch, had knowledge that the opinion letter was inconsistent with the facts contained in the Watson, Ess report. Because it concerned itself with whether fraud had been perpetrated in the summer of 1978 (long after the deliveries of the Watson, Ess Report in December, 1977 and January, 1978), it improperly applied the correct legal standards. Thus, the court abused its discretion in subjecting the report to production.
 
 IV.
 
 24
 Keang Nam strongly urges that it has made a prima facie showing of fraud. All the parties have devoted considerable discussion to what the prima facie standard means and how it applies here. It is unnecessary to further resolve these issues in this appeal because the relationship between the fraud alleged and the communications does not justify piercing the privilege.[6]
 
 
 25
 Decisions regarding the attorney-client privilege should not be based on a rigid analysis. Rather, the focus is on whether the detriment to justice from foreclosing inquiry into pertinent facts is outweighed by the benefits to justice from a franker disclosure in the lawyer's office. C. McCormick, McCormick on Evidence Sec. 87, at 205 (E. Cleary 3d ed. 1984). The Watson, Ess report resulted from ISC's efforts to investigate allegations of prior misconduct. Allowing disclosure of the report could deter such inquiries, which should not be chilled as a matter of policy. See Diversified Industries v. Meredith, 572 F.2d 596, 610 (8th Cir.1978) (en banc) (corporations should be encouraged to "seek out and correct wrongdoing in their own house and to do so with attorneys"). Moreover, denying production of the report will not substantially inhibit inquiry into facts relevant to the underlying lawsuit. The privilege protects the report as a communication; it does not shield the facts contained in the report[7] from being discovered and proven through other sources. On balance, we are convinced that the policies behind the privilege and the law expressed in prior decisions weigh against allowing production. The district court order of March 9 is reversed.
 
 
 
 *
 The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation
 
 
 [1]
 The 8-K report also explained the background of the Watson Ess and Arthur Young investigations as well as their results. The conclusions do not identify questionable transactions by subsidiary, country, or individuals involved. Nevertheless, the report highlighted potential problems with fifteen projects in nine countries, with contract amounts in excess of a billion dollars. More specifically, the report mentioned a 1975 payment of $400,000 to an agent by an ISC subsidiary "for consulting services furnished by the agent in connection with a project for a government-owned client in a foreign country," and mentioned facts suggesting that the payment may have been "questionable." International Systems & Controls Corp., Mar. 1978 Form 8-K at 9. The report also mentioned payments in 1975 of $1.1 million as possibly violating:
 (a) the laws of the country in which the subsidiary [that made the payment] has projects, which laws prohibited the use of certain types of agents, (b) a covenant against the use of certain types of agents in a contract between the subsidiary and its client, a government-owned entity in the country, or (c) an affidavit executed on behalf of the Company that no payments were made to certain types of agents.
 Id. at 10. A complaint later filed by the SEC shows that these incidents were connected to the Hassi R'Mel project, the subject of this lawsuit.
 
 
 [2]
 Neither Schedule 5.6.1 nor Exhibit A mentioned the sensitive payments questions related to the Hassi R'Mel receivable
 
 
 [3]
 Keang Nam urges that we review the district court's finding that ISC had not waived any privileges by giving a copy of the report to the SEC in 1978. This issue was resolved in Fulbright's favor earlier in this litigation. Pritchard-Keang Nam Corp. v. Jaworski, No. 81-1034-CV-W-4, Order at 3-4 (W.D.Mo. Sept. 26, 1983). Although the district court certified the September 26th order under section 1292(b), neither party appealed
 This appeal concerns only the order dated March 9, 1984, which was limited to whether the crime-fraud exception is applicable. Thus, the waiver issue is not subject to review. See United States v. Bear Marine Servs., 696 F.2d 1117, 1118 n. 1 (5th Cir.1983); Time, Inc. v. Ragano, 427 F.2d 219, 221 (5th Cir.1970); 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure Sec. 3929, at 143-44 (1977).
 
 
 [4]
 In diversity cases, privileges are determined according to the state law that supplies the rule of decision. Fed.R.Evid. 501. Rule 501 does not, however, specify which state's privilege rules control. Under the Erie doctrine, a federal court must apply the forum's conflict of laws rules. See Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). This case was brought in Missouri, so Missouri choice of law rules apply. See 23 C. Wright & K. Graham, Federal Practice and Procedure Sec. 5435, at 867-68 (1980). No Missouri case law has decided what the specific choice of law rule is regarding privilege. Nevertheless, the general rule is that the law of the forum governs admissibility of evidence. Rosser v. Standard Milling Co., 312 S.W.2d 106, 110 (Mo.1958). Under these principles, the existence of the crime-fraud exception could be determined by Missouri law. Nevertheless, determining whether a prima facie showing of fraud has been made may be a question of federal law. Cf. Glovatorium, Inc. v. NCR Corp., 684 F.2d 658, 660 (9th Cir.1982) (sufficiency of evidence to support a finding of fraud in a diversity case is a procedural matter governed by federal law)
 
 
 [5]
 Pritchard relies on In re Sealed Case, 676 F.2d 793 (D.C.Cir.1982), in which Judge Wright stated that work-product materials may be subject to discovery if "the client actually committed or attempted a crime or fraud subsequent to receiving the benefit of counsel's work product." Id. at 815 (citing In re Grand Jury Proceedings (FMC Corp.), 604 F.2d 798, 803 (3d Cir.1979); In re Murphy, 560 F.2d at 338). The cases cited by Judge Wright do not support this proposition. Moreover, this portion of the opinion was not joined by the other two judges on the Sealed Case panel. 676 F.2d at 797 (Tamm, J., concurring in result); id. at 825 (Wald, J., concurring only in selected portions of opinion and result). Berkley and Murphy defined the crime-fraud exception in detail and stressed that the legal advice must be sought or obtained in furtherance of or in relation to the fraudulent activity. That the fraud merely follows the attorney-client communication does not alone support discovery. Finally, the weight of authority supports our construction of the crime-fraud exception. See, e.g., In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1039 (2d Cir.1984)(crime or fraud need have "been the objective of the client's communication"); C. McCormick, McCormick on Evidence Sec. 95, at 229 (E. Cleary 3d ed. 1984) (communication is not privileged "where the client's purpose is the furtherance of a future intended crime or fraud")
 
 
 [6]
 There is a serious question whether Pritchard has made a prima facie showing that ISC has committed a fraud. An indispensable element of fraud is that the complainant had a right to rely on the misrepresentation alleged. Sofka v. Thal, 662 S.W.2d 502, 506 (Mo.1983) (en banc); Armstrong v. Tidelands Life Insurance Co., 466 S.W.2d 407, 409 (Tex.Civ.App.1971); 37 Am.Jur.2d Fraud & Deceit Sec. 236, at 315 (1968)
 In its effort to make a prima facie showing, Keang Nam introduced testimony from Norbert Schlei, the attorney who was its primary negotiator in the J.F. Pritchard transaction. Schlei testified that during the summer of 1978 he had asked Frietsch and a Fulbright lawyer about sensitive payments. Frietsch told Schlei that Schlei should talk to the law firm of Surrey, Karasik & Morse, a Washington firm that did some SEC work for ISC. Although Frietsch told Schlei that he would have a Surrey lawyer call Schlei, Schlei never was contacted. Schlei called Charles Reed, a Surrey lawyer with whom he was acquainted. Reed told Schlei that everything he knew about ISC's sensitive payments problem was contained in public reports that had been filed with the SEC. Reed offered to forward the reports to Schlei and stated that he would answer further questions after Schlei had read the reports. Schlei did not follow up on either offer.
 Schlei's contacts with the Surrey firm are explained further in his testimony that was introduced by Fulbright. Schlei testified that during the summer of 1978 he knew that the SEC was conducting an investigation of ISC concerning sensitive payments in its overseas operations. Schlei also testified that he knew that Surrey, Karasik represented ISC in matters dealing with SEC investigations. Finally, Schlei testified that prior to the closing he had read ISC's annual report for the year ending June 30, 1977. This report discussed the sensitive payments investigation that ISC had commenced in cooperation with the SEC. International Systems & Controls Corp., 1977 Form 10-K Annual Report 8-9.
 Considering the evidence in a light most favorable to Keang Nam, Schlei's testimony casts serious doubt upon Keang Nam's right to rely on the Fulbright opinion.
 
 
 [7]
 The Watson, Ess report does not purport to decide whether any of the events it reveals constitute violations of United States or Algerian law. While it discusses activities in detail that might give rise to litigation, proceedings or governmental investigation, the report does not mention any "litigation, proceeding or governmental investigation pending or threatened against or relating to the" Hassi R'Mel project