805 F.2d 155
 1986-2 Trade Cases 67,337, 21 Fed. R. Evid. Serv. 1341
 In re ANTITRUST GRAND JURY.
ADVANCE PUBLICATIONS, INC.; Plain Dealer Publishing Co.;
S.I. Newhouse, Jr., Intervenors-Appellants (85-4053),
Cleveland Press Publishing Co. (currently known as the
Cleveland Liquidating Trust); Joseph E. Cole;
James P. Maloney, Jr.,
Intervenors-Appellants (85- 4068),
Benesch, Friedlander, Coplan & Aronoff; Skadden, Arps,
Slate, Meagher & Flom; and Williams and Connolly,
Related Parties-Appellants (85-4068),
v.
UNITED STATES of America, Defendant-Appellee.
 Nos. 85-4053, 85-4068.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 24, 1986.
Decided Nov. 3, 1986.
 
 James P. Garner, Jonathan E. Thackeray, David G. Holcome, Baker & Hostetler, Cleveland, Ohio, William E. Willis (argued), Richard J. Urowsky, William R. Petricone, Jr., Sullivan & Cromwell, Sabin, Bermant & Blau, New York City, for intervenors-appellants in No. 85-4053.
 Kent Brown, Mark Leddy (argued), Dept. of Justice, Antitrust Div., Washington, D.C., John P. Fonte; John A. Weedon, Marilyn A. Bobula, Michael J. Keane, Dept. of Justice, Cleveland, Ohio, John J. Powers, III, Dept. of Justice, Washington, D.C., for defendant-appellee.
 Richard W. Pogue, William T. Plesec (argued), Stephen J. Squeri, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Kenneth A. Bravo, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, Shepard Goldfein, Skadden, Arps, Slate, Meagher & Flom, New York City, John K. Villa, Williams & Connolly, Washington, D.C., for intervenors-appellants and related parties-appellants in No. 85-4068.
 Before JONES and WELLFORD, Circuit Judges, and GILMORE, District Court Judge*.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 This appeal arises from a grand jury investigation into possible antitrust violations in the sale of certain assets of the now defunct Cleveland Press Newspaper to the Plain Dealer Newspaper of Cleveland. Numerous parties, including the newspapers and their representative law firms in the transaction, have appealed an order of the district court denying disclosure of grand jury testimony and compelling production of certain documents withheld as privileged attorney-client communications and attorney work product material. Appellant Plain Dealer Publishing Company, its parent company, Advance Publications, Inc., its chairman, S.I. Newhouse, Jr., and their counsel, Sullivan & Cromwell, and Sabin, Bermant & Blau, appeal that part of the district court order compelling production of the legal materials and denying a motion to order the secrecy of the grand jury proceedings. Appellant Cleveland Press Publishing Company, along with two of its principals, Joseph E. Cole, and James P. Maloney, Jr., and their intervening counsel, Benesch, Friedlander, Coplan & Aronoff; Skadden, Arps, Slate, Meagher & Flom; and Williams & Connelly, appeal that part of the district court order denying disclosure of the grand jury document and granting the government's motion for compelling production of the legal material. We affirm the district court's denial of the appellants' motion to disclose grand jury testimony and to order grand jury secrecy, but we reverse and remand, in part, the order compelling the broad production of legal materials.
 
 
 2
 The undisputed facts giving rise to the grand jury investigation are as follows. Prior to 1980, the Press was owned and operated by E.W. Scripps Company. Scripps had sustained substantial operating losses prior to 1980. On October 31, 1980, Scripps sold the Press to Press Publishing Company and its principal shareholder, Joseph Cole, for one million dollars in cash and a seven million dollar promissory note. When Cole took over operations, he instituted several ideas designed to increase circulation and profits. These changes included installation of modern presses and the introduction of a morning and Sunday edition. Despite these changes, the Press continued to lose money.
 
 
 3
 Cole met with S.I. Newhouse, chairman of Advanced Publications and the Plain Dealer on two occasions in late 1981, to propose that the two newspapers enter a joint operating agreement as a means of stemming the Press' continuing losses. Newhouse rejected the idea on both occasions. By late 1981, Cole had formed a limited partnership with James P. Maloney for the purpose of purchasing the Press' real property.
 
 
 4
 On February 25, 1982, Maloney incorporated Del-Com with a stated capital of $500 and secured financing of $375,000 in order to commence operations. Del-Com was a telemarketing firm that solicited new subscribers and advertisers exclusively for the Press. It offered a total market program to advertisers throughout the greater Cleveland Metropolitan area. This program was accomplished by providing newspaper advertising inserts to Press subscribers and an identical advertising publication, by either mail or hand delivery, to nonsubscribers of the Press. Del-Com operated with the assistance of Press employees and facilities.
 
 
 5
 During the first half of 1982, the Press also commissioned a consultant to contact potential buyers for the Press. By May of 1982, the consultant had found no interested buyers.
 
 
 6
 Cole met with Newhouse in New York for a third time on March 19, 1982, to discuss again the possibility of a joint operating agreement, but Newhouse rejected the idea. Cole and Newhouse (along with Maloney and each of the principals' lawyers) met again in New York on May 13, 1982. The substance of this meeting plays a central role in the investigation in this case. Because of the ongoing grand jury investigation, the specifics of that meeting will not be recounted here. Essentially, Newhouse orally agreed to buy the Press' subscription list for 14.5 million dollars and Del-Com for eight million dollars.
 
 
 7
 For the next two months the lawyers for the parties negotiated the terms of the sale. The final sales agreement, dated June 10, 1982, provided for the transfer of the subscription list. The Del-Com transaction took the form of an option agreement exercisable on March 1, 1983. On June 17, 1982, the Press announced publicly that it was ceasing its operations.
 
 
 8
 In 1984, the Antitrust Division of the Department of Justice empaneled a grand jury to investigate possible criminal antitrust violations arising out of the closing of the Press, especially the purchase of the Press' subscription list and Del-Com by the Plain Dealer. The underlying theory of the government was that the Plain Dealer induced the Press to close by buying its assets for substantially more than their actual value in an attempt to monopolize the newspaper market in Cleveland.
 
 
 9
 This case initially arose from the grand jury issuance of subpoenas duces tecum upon the Plain Dealer, the Press and their legal representatives seeking a number of documents. These parties refused the request for many of the documents, asserting attorney-client privilege and the attorney work product doctrine. Three motions were filed in the district court. The government filed a motion for in camera inspection and to compel production of the documents (Exhibit C) on the basis of a summary of grand jury testimony, called Exhibit B. Each of the parties opposed the motion and the Cleveland Press and its law firms moved for an order disclosing or striking Exhibit B. The Plain Dealer also moved for an order to ensure grand jury secrecy.
 
 
 10
 The district court wrote an opinion under seal disposing of each motion seriatim. The district court denied the motion to disclose Exhibit B on the basis that disclosure of grand jury testimony would "play havoc with the grand jury's remaining work." It granted the government's motion to compel the production of the documents in part. It ruled that the crime-fraud exception to the attorney client privilege and the work product doctrine required that the parties produce all documents retained solely on the basis of the privilege and all "fact" work product. All "opinion" work product was not ordered to be produced. Finally, the motion to ensure grand jury secrecy was denied for mootness and for not being within the secrecy rule of Rule 6(e)(2) of the Federal Rules of Criminal Procedure.
 
 I.
 
 11
 After reviewing Exhibit B, the district court ruled that the appellants failed to establish that their need for the information outweighed the continued need for grand jury secrecy to permit disclosure under Rule 6(e)(3) of the Federal Rules of Criminal Procedure. It listed three concerns with any release of the information: potential witnesses might be intimidated; witnesses who had already testified could be threatened; and possible targets of the investigation might escape. It relied on this circuit's opinion in In re Grand Jury Proceedings--Gordon, Witness, 722 F.2d 303 (6th Cir.1983), cert. denied, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984), in upholding its authority to conduct an in camera review of Exhibit B in order to resolve the conflicts over whether the government had established the crime-fraud exception to compel the release of the documents listed in Exhibit C.
 
 
 12
 The grand jury is a valuable and enshrined institution in our criminal justice system. It has been granted extraordinary powers of investigation and the ultimate responsibility to determine whether there is probable cause to believe a crime has been committed. United States v. Sells Engineering, Inc., 463 U.S. 418, 423, 103 S.Ct. 3133, 3137, 77 L.Ed.2d 743 (1983). In order to enable the grand jury to carry out its duties to safeguard the public as efficiently and successfully as possible, there has been a longstanding policy that grand jury deliberations should be conducted in secret. Id. at 424, 103 S.Ct., at 3138; United States v. Proctor & Gamble Co., 356 U.S. 677, 681, 78 S.Ct. 983, 985, 2 L.Ed.2d 1077 (1958). To maintain the secrecy of the grand jury, the government is generally prohibited from disclosing, any testimony heard by the grand jury. Fed.R.Crim.P. 6(e)(2).
 
 
 13
 Rule 6(e)(3)(C) of the Federal Rules of Criminal Procedure provides for an exception to the general rule prohibiting disclosure of grand jury testimony. That rule provides in relevant part:
 
 
 14
 (C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made--
 
 
 15
 (i) when so directed by a court preliminary to or in connection with a judicial proceeding....
 
 
 16
 A party requesting grand jury information must show the need "with particularity" so that "the secrecy of the proceedings [may] be lifted discreetly and limitedly." Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 221, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979), (citing United States v. Proctor & Gamble Co., 356 U.S. at 682, 78 S.Ct. at 986). This is satisfied by a showing that: (1) the material sought is needed to avoid a possible injustice in another judicial proceeding; (2) the need is greater than the need for continued secrecy; and (3) the request is structured to obtain only the material needed. Id. 441 U.S. at 222, 99 S.Ct. at 1674. The district court has substantial discretion when considering a request to disclose grand jury testimony. Id. at 223, 99 S.Ct. at 1675.
 
 
 17
 The appellants challenge the denial of their disclosure request on two grounds. First, they argue that the district court's in camera inspection of Exhibit B denied them their due process rights. Second, they contend that the district court failed to recognize their particular needs or to balance the specific needs of the parties in this case when it declined to order the disclosure of Exhibit B. In camera inspection, they argue, deprives them of the opportunity both to refute any false or misdirected information provided in Exhibit B and to place any grand jury testimony in the "appropriate business context."
 
 
 18
 In support of its decision to inspect Exhibit B in camera, the district court relied on the one case with a similar factual basis decided in this circuit. In In re Grand Jury--Gordon, Witness, supra, the court addressed an argument that the ex parte submission of a sealed affidavit in order to establish the crime-fraud exception violated the movant's due process rights. The court reviewed two cases from other circuits in resolving the issue. See In re John Doe Corp., 675 F.2d 482 (2d Cir.1982); In re Special September 1978 Grand Jury, 640 F.2d 49 (7th Cir.1980). Of particular relevance is the Second Circuit's decision where it recognized that the appellants would be hampered in presenting their case, but ruled that "the limitations on adversary argument caused by in camera submissions are clearly outweighed by the benefits of obtaining a judicial resolution of a preliminary evidentiary issue while preserving confidentiality" when the two interests are in conflict. In re John Doe, 675 F.2d at 490.
 
 
 19
 After reviewing these cases, this circuit in In re Grand Jury--Gordon concluded:
 
 
 20
 This Court is persuaded that an in camera submission on the facts of this case was a reasonable accommodation of the need to maintain secrecy of the grand jury investigation and the need for prompt resolution of the privilege issue. Hence, this Court finds no abuse of discretion and no deprivation of appellant's right to due process.
 
 
 21
 722 F.2d at 310.
 
 
 22
 The appellants, however, challenge the validity of this pronouncement. They argue that the court's statement in In re Grand Jury--Gordon should be disregarded because the holding on the issue was dicta. The appellants are correct that the case was effectively resolved after the court made a threshold determination that the information sought by the government was not within the scope of the attorney-client privilege. However, we are in agreement with the district court's statement that the circuit's "clear statement of acceptance of the procedure" should not be disregarded. A number of other circuits have sanctioned the use of in camera inspections of grand jury testimony. In re Grand Jury Proceedings, Vargas, 723 F.2d 1461, 1467 (9th Cir.1983), cert. denied, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984); In re Grand Jury Proceedings in the Matter of Freeman, 708 F.2d 1571, 1576 (11th Cir.1983); Marc Rich & Co. v. United States, 707 F.2d 663, 670 (2nd Cir.), cert. denied, 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983); In re Grand Jury Proceedings, 674 F.2d 309, 310 (4th Cir.1982); In re Special September 1978 Grand Jury, 640 F.2d 49, 57 (7th Cir.1980). Thus, we believe that in camera inspection is not a per se denial of due process where, as here, there are conflicting needs.
 
 
 23
 To determine whether in camera inspection was proper under the facts of this case, the government's interest must be balanced against the interests of the appellants. In re Taylor, 567 F.2d 1183, 1188 (2d Cir.1977). We believe that the balance in these types of cases should always be weighted presumptively toward the government when the targets of a grand jury investigation are requesting disclosure of grand jury testimony for use in that proceeding. There is a grave potential that the investigation could be severely impeded if the request is granted. This is not a case where the governmental interests are minimal, id., nor is it a case where the parties have no notice or idea of the basis for the government's request. Appeal of Hughes, 633 F.2d 282, 291 (3d Cir.1980). This is a case where the appellants are and have been aware of the investigation and its inquiry for some time. Moreover, this is not a situation where the government can easily manufacture false evidence to secure the documents it seeks. The district court must still closely scrutinize the motion and the in camera exhibits in support of that motion.
 
 
 24
 Appellants' argument that the district court did not balance the Douglas Oil factors in assessing their needs is also ineffective. The district court could not show the specific factors it considered in balancing the conflicting needs because to do so would have required it to reveal information contained in Exhibit B. We, like the district court, are limited in our ability to discuss the contents of Exhibit B. However, we, too, have reviewed Exhibit B, and the generalized concerns the district court recognized in its opinion regarding the potential devastating effect disclosure would have on the continuing grand jury investigations do apply. These same concerns were also recognized in Douglas Oil, 441 U.S. at 219, 99 S.Ct. at 1673.
 
 
 25
 Even if we were to conclude that those generalized concerns were not shown, the appellants nevertheless failed to satisfy the first of the Douglas Oil factors. The appellants did not and cannot make a showing that the material sought is needed to avoid a possible injustice in another judicial proceeding. There is not a separate and distinct proceeding in this case. As we noted above, some of the parties seeking disclosure of Exhibit B are the actual targets of the grand jury investigation and seek to use the testimony to keep from producing legal documents in that same proceeding. We have not found a case where disclosure has been ordered in such an instance, and the appellants have not cited one. Only in the most exceptional of circumstances can we envision the disclosure of grand jury testimony to the subjects of the investigation. This case does not present one of those exceptional circumstances.
 
 II.
 
 26
 The policies underlying the attorney-client privilege and the attorney work product doctrine are well documented in the annals of legal history. The purpose of the attorney-client privilege is to encourage clients to communicate freely and completely with their attorney. Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981); Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1975). The privilege also serves the purpose of promoting "broader public interests in the observance of law and administration of justice." 449 U.S. at 389, 101 S.Ct. at 682. However, it is not an absolute privilege. It applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice. 425 U.S. at 403, 96 S.Ct. at 1577. Under some circumstances the privilege is to be vary narrowly construed. In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 451 (6th Cir.1983), cert. denied, 467 U.S. 1267, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984) (when needs of grand jury conflict). All reasons for the attorney-client privilege are completely eviscerated when a client consults an attorney not for advice on past misconduct, but for legal assistance in carrying out a contemplated or ongoing crime or fraud. Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933); In re Grand Jury Subpoena Duces Tecum, 31 F.2d 1032, 1038 (2d Cir.1984); In re Murphy, 560 F.2d 326, 337 (8th Cir.1977).
 
 
 27
 There may be some overlap, but the work product doctrine "is distinct from and broader than the attorney-client privilege." United States v. Nobles, 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170 n. 11, 45 L.Ed.2d 141 (1975). Where only confidential communications are protected by the attorney-client privilege, the work product doctrine protects any document prepared in anticipation of litigation by or for the attorney. In re Special September 1978 Grand Jury, 640 F.2d at 62. Moreover, only the client may assert the attorney-client privilege while both the attorney and the client may invoke the work product doctrine. Id.
 
 
 28
 The premier case shaping the contours of the work product doctrine is Hickman v. Taylor, 329 U.S. 495, 510, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1946). The Supreme Court in Hickman observed the dangers inherent in permitting unwarranted disclosure of an attorney's work product materials and limited the scope of the discovery of those materials.
 
 
 29
 Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways--aptly though roughly termed by the Circuit Court of Appeals in this case as the "work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore, inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.
 
 
 30
 We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had.
 
 
 31
 329 U.S. at 510-11, 67 S.Ct. at 394. (emphasis added).
 
 
 32
 Some courts interpreting Hickman have defined two types of work product. Ordinary fact or "unprivileged fact" work product, as referred to in Hickman, is written or oral information transmitted to the attorney and recorded as conveyed by the client. In re Sealed Case, 676 F.2d 793, 811 (D.C.Cir.1982); In re Doe, 662 F.2d 1073, 1077 (4th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); In re Special September 1978 Grand Jury, 640 F.2d at 63. The presumption in favor of nondisclosure is shifted with respect to fact work product. When there has been an ongoing client crime or fraud, any privilege to fact work product is waived and the "scale tips in favor of disclosure." 640 F.2d at 63.
 
 
 33
 Opinion work product is any material reflecting the attorney's mental impressions, opinions, conclusions, judgments or legal theories. Hickman, 329 U.S. at 511, 67 S.Ct. at 393; Upjohn, 449 U.S. at 399, 101 S.Ct. at 687; In re Special September 1978 Grand Jury, 640 F.2d at 63; In re Sealed Case, 676 F.2d at 809-10. The Court in Hickman observed that "[n]ot even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." 329 U.S. at 510, 67 S.Ct. at 393. One court has interpreted Hickman as giving opinion work product nearly absolute immunity. In re Murphy, 560 F.2d at 336. But even this privilege can be waived by a client when the attorney was consulted in furtherance of a crime or fraud. In re Sealed Case, 676 F.2d at 812. However, since this privilege is jointly shared, an unknowing attorney may successfully assert the privilege even in the face of a client's fraud or crime. Id. Indeed, there may be rare occasions when the attorney knowingly participates in a guilty client's ongoing fraud or crime. In those rare instances, none of the public policies advanced in support of the privilege would be served if an attorney who committed a crime or fraud could shield himself from prosecution or litigation because he asserted the work product doctrine. See In re Doe, 662 F.2d at 1078. Therefore, to speak of the work product doctrine as an absolute privilege enjoyed by either the attorney or the client is wrong.
 
 
 34
 Essentially, the overriding purpose of both the attorney-client and the work product privileges is to encourage the proper functioning of the adversary system. In re Grand Jury Proceedings, 604 F.2d 798, 802 (3rd Cir.1979). Often, however, these privileges come into conflict with other societal interests when they are invoked during a grand jury investigation.
 
 
 35
 [I]nvocation of [either] privilege before the grand jury could jeopardize an effective and comprehensive investigation into alleged violations of the law, and thereby thwart that body's dual functions of determining "if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions."
 
 
 36
 In re Grand Jury Investigation No. 82-2-35, 723 F.2d at 451, (citing Branzburg v. Hayes, 408 U.S. 665, 686-87, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972)).
 
 
 37
 Recognizing this inherent tension between the two interests, the courts have applied an exception when the otherwise protected communications or materials are made in furtherance of a crime or fraud. As it has been so designated, the crime-fraud exception has been applied in a number of cases where the attorney-client privilege has been invoked during the grand jury investigation. Clark v. United States, 289 U.S. at 15, 53 S.Ct. at 469; In re Sealed Case, 754 F.2d 395, 399 (D.C.Cir.1985); In re Grand Jury Subpoena Duces Tecum Dated Sept. 15 1983, 731 F.2d 1032, 1038 (2d Cir.1984); In re Sealed Case, 676 F.2d 793, 812 (D.C.Cir.1982). The exception has also been applied in cases involving a privilege asserted under the work product doctrine. In re International Systems & Controls Corp., 693 F.2d 1235, 1242 (5th Cir.1982); In re Sealed Case, 676 F.2d at 812; In re Doe, 662 F.2d at 1079; In re Special September 1978 Grand Jury, 640 F.2d 49, 63 (7th Cir.1980); In re Grand Jury Proceedings, 604 F.2d at 802.
 
 
 38
 The government sought to compel the production of a number of documents listed in Exhibit C. In analyzing whether the documents requested by the government were within the crime-fraud exception to the attorney-client privilege or attorney work product doctrine, the district court utilized a test formulated and applied by a number of other circuits. First, the government must make a prima facie showing that a sufficiently serious crime or fraud occurred to defeat the privilege; second, the government must establish some relationship between the communication at issue and the prima facie violation. See, e.g., In re Sealed Case, 754 F.2d at 399.
 
 
 39
 The court relied on the "evidence presented in Exhibit B as supplemented by the facts of a related case," Province v. Cleveland Press Pub. Co., 605 F.Supp. 945 (N.D.Ohio 1985), aff'd, 787 F.2d 1047 (6th Cir.1986), in concluding that a prima facie antitrust violation had occurred. It described the burden satisfied by the Government to support the prima facie violation as that which would "permit a court to deny an initial motion for a directed verdict if such proof were submitted at trial." The court further reasoned that since the government had established a prima facie case that the transaction violated the Sherman Act, all legal assistance provided by the law firms was in furtherance of that violation. It then ordered the appellants to produce every document requested by the Government in Exhibit C that was withheld as privileged attorney-client material. It also ordered the appellants to produce all documents withheld that constituted fact work product. All opinion work product was found to be protected by the doctrine. The court retained the power to conduct an in camera examination of that document in the event that any of the parties disputed the characterization of any document.
 
 A. Prima Facie Legal Standard
 
 40
 The appellants argue that the district court applied the wrong legal standard in determining that the government made a prima facie showing of a violation. In particular, they argue that the district court's interpretation of a prima facie showing to mean that the government need only meet the evidentiary standards sufficient to defeat an initial directed verdict motion is inappropriate and has no foundation in the law. The appellants press this court to adopt a standard that such evidence needs to be "direct" evidence or "compelling circumstantial" evidence.
 
 
 41
 This circuit has yet to formulate an evidentiary standard for determining whether a prima facie violation has been established under the crime-fraud exception. The standard first evolved in Clark v. United States, 289 U.S. at 15, 53 S.Ct. at 469. The Supreme Court described the evidence needed to satisfy the prima facie standard as "something to give colour to the charge ... that has some founation in fact." Id. The Second Circuit has defined the Clark standard in terms of the government showing probable cause to believe a crime or fraud was committed. In re Grand Jury Proceedings, 731 F.2d at 1039; In re John Doe Corp., 675 F.2d 482, 491 (2d Cir.1982). The Fifth Circuit has adopted the Black's Law Dictionary definition: "[evidence] such as will prevail until contradicted and overcome by other evidence ... [a] case which has proceeded upon sufficient proof to that stage where it will support finding if evidence to contrary is disregarded." Black's Law Dictionary 1071 (4th ed. 1973); In re International Systems and Controls Corp., 693 F.2d at 1242; In re Grand Jury Matter of Fine, 641 F.2d 199, 203 (5th Cir.1981). The District of Columbia Circuit has stated that the government can establish a prima facie showing if it "offers evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." In re Sealed Case, 754 F.2d at 399.
 
 
 42
 None of the standards enunciated above place as high a burden of production on the government as that suggested by the appellants' "direct or compelling circumstantial evidence" standard. We, therefore, reject it as the standard for this circuit. The evidence produced by the government must raise more than a strong suspicion that a crime was committed to establish a prima facie violation, see In re Grand Jury in the Matter of Fine, 641 F.2d at 204, but it need not be as strong as that needed to effect an arrest or secure an indictment. This matter is also not similar to the trial stage where the government needs to prove the existence of a crime or fraud beyond a reasonable doubt. In re Sealed Case, 754 F.2d at 399. Clark only described the necessary showing as that giving "colour to the charge ... that has some foundation in fact." That definition denotes a standard qualitatively different from a "direct or compelling circumstantial" standard. We do not believe that Clark countenances that such a heavy burden be placed on the government during the grand jury stage.
 
 
 43
 The Second Circuit noted in In re Grand Jury Subpoena Duces Tecum, that there are not practical differences between the probable cause standard and the prima facie standards formulated in the circuits. 731 F.2d at 1039. "Both require that a prudent person have a reasonable basis to suspect the perpetration of a crime or fraud." Id. Accord In re Sealed Case, 754 F.2d at 399 n. 3. We are persuaded by the Second Circuit's enunciation and adopt it as our evidentiary standard of a prima facie showing. It is the most objective definition of what we believe the Supreme Court meant when it stated that the government must present evidence to give "colour to the charge."
 
 
 44
 The district court's formulation of the standard is problematic. In its opinion, it very methodically analyzes the standard, citing the precise language of the cases referred to above. Notwithstanding this analysis, it went on to create a new evidentiary standard for making a prima facie showing--"evidence which would permit a court to deny a directed verdict if such proof were submitted at trial." Under the Fifth Circuit's standard this standard might suffice. Black's Law Dictionary states that a "prima facie case consists of sufficient evidence to get plaintiff past a directed verdict." The directed verdict standard is not, however, appropriate in weighing whether the government has established a prima facie case. Minimum proof to get past a directed verdict is generally less than what we believe is needed for the government to meet its burden. Rockwell International Corp. v. Regional Emergency Med. Serv., 688 F.2d 29, 31 (6th Cir.1982) ("directed verdict is appropriate if there is complete absence of pleading or proof on issue or issues material to cause of action or where there are no controverted issues of fact upon which reasonable men could differ").
 
 
 45
 Our rejection of the "directed verdict" standard does not mean, however, that the district court abused its discretion when it determined that the government had established a prima facie case. While the district court's formulation may have been lacking the precise form we prefer, we are not convinced that the district court's underlying considerations of the standard failed to mirror those reflected in our articulation above. We must still consider whether that evidence sufficed under the Second Circuit's standard.
 
 B. Exhibit B
 
 46
 We now turn to the question of whether the evidence submitted by the government in Exhibit B establishes a prima facie showing of a Sherman Act violation. The government's theory in the grand jury investigation was that the Plain Dealer's purchase of Press assets was in reality a buy-out of the entire Press operation in violation of the Sherman Act, 15 U.S.C. Secs. 1 & 2 (1982). The government's burden before the district court, therefore, was to make a sufficient showing that a "prudent person would have a reasonable basis to suspect" that an antitrust violation was committed when the Plain Dealer purchased the subscription list and Del-Com.
 
 
 47
 We face somewhat of a dilemma in evaluating the evidence in Exhibit B. The exhibit is a summary of grand jury testimony and, as we have concluded, the rules of secrecy prevent its content from being revealed. The courts alone are entrusted with the responsibility of ensuring that the evidence is sufficient to carry the government's burden. We have independently reviewed Exhibit B and find that the evidence forms a "reasonable basis to suspect" that the transactions constituted a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, and an attempt to monopolize Cleveland's newspaper market in violation of Section 2 of the Act. The evidence in Exhibit B forms a reasonable basis for concluding that the negotiations surrounding the transactions were not legitimate and that the price paid for the Press subscription list and Del-Com was grossly disproportionate to their actual value. We do not intend to suggest by our conclusion that actual antitrust violations have been committed; we only hold that the government's evidence, viewed alone, does present a reasonable basis for suspecting that a crime was committed.C. District Court's Evaluation of Evidence
 
 
 48
 The appellants argue that the district court erred in relying on the facts of the Province opinion and in failing to consider the evidence the appellants submitted when the district court determined that the government had established a prima facie case. A summary of the pertinent facts of the Province opinion is provided below:
 
 
 49
 In October of 1981, Scripps sold the Press (including its subscription list) to Press Publishing for $1 million in cash and a $7 million promissory note. In June of 1982, Press Publishing sold the subscription list alone to Plain Dealer for $14.5 million. In February of 1982, Del-Com was established with $500 in capital. It immediately incurred substantial debts and losses. Four months later, Plain Dealer signed with its owners a guaranteed one-year service contract including advanced expenses; a $1 million loan agreement; and an $8 million purchase option agreement, exercisable at Del-Com's option.
 
 
 50
 605 F.Supp. at 953.
 
 
 51
 Appellants contend that the district court should not have relied on the facts of the Province opinion because the facts were not necessary to the court's decision. It is true that the defendants in Province were granted a summary judgment on standing grounds and thus never litigated the facts of that case. Under the theory of collateral estoppel, a factual finding in one proceeding is not binding on the parties in a subsequent proceeding "unless the finding acted as a basis for final judgment in the first." See Marlene Indus. Corp. v. National Labor Relations Board, 712 F.2d 1011, 1015 (6th Cir.1983) (quoting United States v. School Dist., 577 F.2d 1339, 1349 (1978)). The district court's reference to the Province opinion does not, however, render its ruling erroneous. When discussing its consideration of the evidence in this case the district court stated that the facts of the Province opinion were only a supplement to the evidence in Exhibit B. In our view, the district court's decision was not contingent on the facts in Province, but was bottomed primarily on the evidence in Exhibit B. It appears that the district court only referred to the facts of Province because it was not permitted to disclose the contents of Exhibit B.
 
 
 52
 Appellants next contend that the district court erred in not considering the entire evidentiary record in this case.[1] They seek to include evidence that they believe will place the government's evidence in the proper business perspective. Appellants again, however, misperceive the nature of the government's burden at the grand jury stage. Judge Skelly Wright of the District of Columbia Circuit discussed the government's burden and the district court's consideration of that burden when a privilege has been invoked in a grand jury proceeding:
 
 
 53
 Because of the need for speed and simplicity at the grand jury stage, courts should not employ a standard that requires them to hear testimony or to determine facts from conflicting evidence. The necessary amount of evidence should be roughly the same as that required to meet a burden of production.
 
 
 54
 In Re Sealed Case, 676 F.2d at 815 n. 88.
 
 
 55
 Weighing conflicting evidence is the sole dominion of the grand jury when deciding whether to seek an indictment or of the fact finder at trial when determining a defendant's innocence or guilt. The district court's role in determining whether the crime-fraud exception has been established is merely that of a purveyor of relevant evidence to the grand jury. If the district court were required to weigh all conflicting evidence, it would be tantamount to a mini-trial, which the courts do not sanction at the grand jury stage. See United States v. Dionisio, 410 U.S. 1, 15-17, 93 S.Ct. 764, 772-73, 35 L.Ed.2d 67 (1973); In re Sealed Case, 754 F.2d at 402 n. 7; In re Special September 1978 Grand Jury, 640 F.2d at 57. Therefore, the district court did not err in considering only the evidence submitted by the government.[2]
 
 D. Scope of the Discovery Order
 
 56
 The scope of the district court's discovery order is inextricably intertwined with its consideration of the second step in the crime-fraud analysis. The district court found that since the government had established a prima facie case of a Sherman Act violation, all the documents in Exhibit C were communicated or done in furtherance of that violation. It made this determination without reviewing the documents in camera. We find this to be plain error. Every circuit that has considered the crime-fraud exception to a claim of privilege has reviewed the documents in camera before deciding whether they should be produced. See Pritchard-Keang Nam Corp. v. Jaworski, 751 F.2d 277, 280 (8th Cir.1984), cert. dismissed, 472 U.S. 1022, 105 S.Ct. 3491, 87 L.Ed.2d 625 (1985); In re Grand Jury Subpoena Duces Tecum, 731 F.2d at 1036-39 (2d Cir.); In re Sealed Case, 676 F.2d at 804 (D.C.Cir.); In re Special September 1978 Grand Jury, 640 F.2d at 58 (7th Cir.); In re Berkley & Co., 629 F.2d 548, 553 (8th Cir.1980); In re Grand Jury Proceedings (FMC Corp.), 604 F.2d 798, 800 (3d Cir.1979); In re Murphy, 560 F.2d 326, 331 (8th Cir.1977); Pfizer Inc. v. Lord, 456 F.2d 545, 551 (8th Cir.1972); Union Camp Corp. v. Lewis, 385 F.2d 143, 144 (4th Cir.1967).
 
 
 57
 Since all of the appellants have asserted their privileges in this case, the only way the district court can determine if any of the documents are subject to a subpoena under the crime-fraud exception is by reviewing them. Ordering production en masse creates the potential that some material not within the scope of the crime-fraud exception could be ordered produced. For example, merely because some communications may be related to a crime is not enough to subject that communication to disclosure; the communication must have been made with an intent to further the crime. Pritchard Keang Nam Corp. v. Jaworski, 751 F.2d at 282 (fraud made after communication); In re Grand Jury Subpoena Duces Tecum, 731 F.2d at 1041 (crimes past or completed); United States v. Dyer, 722 F.2d 174, 177 (5th Cir.1983) (communication made during contemplated crime but not related).
 
 
 58
 We agree with the district court that any documents containing client communications made in furtherance of the alleged crime must be produced. Also, any documents containing fact work product should be produced if found to be within the crime-fraud exceptions. The government has not implicated any of the law firms in any illegal conduct. This fact does not, however, give them an absolute shield to protect their opinion work product. Should the district court review the documents and find that the law firms were knowing and willing conspirators in the alleged crime, then all opinion work product made in furtherance of the alleged crime should also be produced.
 
 
 59
 We are a little confounded as to why the district court did not review the documents in camera before ordering them produced. Not only do we believe in camera review is mandated to determine the scope of the order, in camera review of the documents could have assisted the court in determining whether a prima facie violation had been made. We find this procedure proper, particularly when the government's only evidence is grand jury testimony not subject to disclosure. See generally In re Grand Jury Subpoena Duces Tecum, 731 F.2d at 1036-41. Therefore, we hold that the district court erred in not reviewing the documents in Exhibit C in camera in order to determine whether they reflect communications or work product made in furtherance of a contemplated or ongoing Sherman Act violation, and remand this case with orders for the district court to review the documents.
 
 III.
 
 60
 Finally, the Plain Dealer appellants appeal the district court's order denying a motion to ensure that the grand jury proceedings are held in a secure facility and to order government staff to refrain from commenting on the investigation in violation of the grand jury secrecy rule, Rule 6(e) of the Federal Rules of Criminal Procedure. The former request appears to be moot as the district court found. The proceedings have been moved to newly renovated grand jury rooms. There has been no real evidence presented to suggest that the new facilities would not be secure. As for the second request, before appellants are entitled to an order they have the burden of making a prima facie showing of a Rule 6(e) violation. United States v. Eisenberg, 711 F.2d 959, 964 (11th Cir.1983). We have reviewed the record and find no evidence whatsoever that Rule 6(e) was violated. The district court, therefore, did not abuse its discretion in denying the orders.
 
 
 61
 We have addressed all of the issues raised by the appellants in this case. As indicated above, we AFFIRM the district court's order denying appellants' motion to disclose Exhibit B, AFFIRM the order denying appellants' motion to ensure grand jury secrecy, REVERSE the production of the documents in Exhibit C and REMAND with instructions to review all documents in Exhibit C in camera to determine if each document individually may be produced under the crime-fraud exception.
 
 
 
 *
 Honorable Horace W. Gilmore, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The Plain Dealer appellants actually made a motion to enlarge the record to include the grand jury testimony of S.I. Newhouse, Jr., and Donald E. Newhouse, which the district court denied
 
 
 [2]
 Appellants cite the recent Supreme Court decision in Matsushita Electric Indus. Co. v. Zenith Radio Corp., --- U.S. ----, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), for the proposition that a court needs to evaluate the alleged illegal conduct in its full factual context to determine whether a prima facie case of an antitrust violation has been established. Matsushita is, however, inapposite. That case addresses a civil antitrust claim at the summary judgment stage. It did not involve a grand jury investigation into alleged criminal activity, nor was it addressing an issue pertaining to the crime-fraud exception