## In re SOUTHERN AND EASTERN DISTRICT ASBESTOS LITIGATION.

**This Document Relates To Alfred Martino.**

**No. 87 Civ. 8783 (WK).**

United States District Court, S.D. New York.

Feb. 15, 1990.

---

**11.** See footnote 7, *supra.*

Robert I. Komitor, Levy Phillips & Konigsberg, New York City, for plaintiff.

Daniel J. Sullivan, Christy & Viener, New York City, for defendant Owens–Corning Fiberglas Corp.

George Hritz, Davis, Markel & Edwards, New York City, Arthur Bromberg, Picillo, Harvey, Bromberg & Caruso, Fairfield, N.J., for defendant Eagle–Picher Industries, Inc.

Amalia G. Pena, Anderson Kill Olick & Oshinsky, New York City, for defendants

**584**

ACandS, Inc., Armstrong World Industries, Inc., Certainteed Corp., GAF Corp., Keene Corp. and United States Gypsum Co.

Lawrence A. Beckenstein, Killarney Brody & Fabiani, New York City, for defendant Rock Wool Mfg. Co.

James R. Lynch, Winston & Strawn, Cole & Dietz, New York City, for defendant The Flintkote Co.

Suzanne M. Halbardier, Barry, McTiernan & Moore, New York City, for defendant Empire Ace Mfg. Co.

Gary Untracht, Danaher, Tedford, Lagnese & Neal, New York City, for defendants Fibreboard Corp. and Pittsburgh Corning Corp.

Gita F. Rothschild, McCarter & English, Newark, N.J., for defendant Owens–Illinois, Inc.

George H. Parsells, III, Connell, Foley & Geiser, Roseland, N.J., for defendants H.K. Porter Co., Inc. and Southern Textile Corp.

Eugene H. Lieber, Lieber & Lieber, New York City, for defendant U.S. Mineral Products Co.

Joseph P. Loughlin, Gordon & Silber, New York City, for third-party defendant Mansville Personal Injury Trust.

WHITMAN KNAPP, District Judge.

We have before us several *in limine* motions asking that we rule on the admissibility of certain documents that the plaintiff has unearthed either from the two moving defendants' files or in other circumstances which might reasonably lead one to believe that at some point they came to a particular defendant's attention. These documents are all offered to show that such defendant failed to heed warnings purported to be conveyed by the document or documents at issue; and that punitive and other damages should therefore be assessed against it. We are not the first court to rule on their admissibility, and, if the number of asbestos actions now pending against these particular defendants is any indication, we will not be the last.

Specifically, defendant Eagle–Picher has moved for the exclusion of the Spencer Memorandum (and the related testimony of Robert Bockstahler), the Bureau of Mines documents, the Harrington Letter, and the Aber Report. Defendant Owens–Corning Fiberglas has moved to exclude the Saranac Lake Study documents. For reasons that follow, we admit the Spencer Memorandum, the Harrington Letter and the Aber Report, and exclude the Bureau of Mines and Saranac Lake Study documents.

*The Spencer Memorandum and the Related Bockstahler Testimony.*

■ Although the facts surrounding the Spencer memorandum and the related Bockstahler testimony are relatively complex, those necessary for deciding this motion are essentially simple. The memorandum in question—which appears on its face to be privileged and which for present purposes we presume not to have been knowingly and voluntarily disclosed to any third party—purports to be a lawyer's summary of responses of one Dr. Kenneth Smith on February 19, 1964 to various inquiries concerning the hazards of defendant Eagle Picher's insulation plant. The document makes clear that Dr. Smith, on the defendant's behalf, had conducted a thorough examination of the plant and had reached the definite conclusion that the defendant's "cement operation, or any operation involving ... asbestos would constitute an occupational hazard."

In 1982, the document and its contents became known to one Robert Bockstahler. According to his deposition testimony in another asbestos case (the "related Bockstahler testimony"), he was instructed by various lawyers acting on defendant's behalf that the document was covered by the attorney-client privilege and that he should never reveal its existence (let alone his knowledge of its content) to anyone. Despite these limiting instructions, he was on numerous subsequent occasions designated by the defendant as the appropriate person to testify on its behalf in asbestos litigations. On each such occasion, he testified (contrary to his obvious knowledge) that the company was not aware of the dangers precisely described by Dr. Smith.

The question of whether or not this document was privileged and should therefore be deemed inadmissible has been litigated in numerous asbestos lawsuits. The most careful consideration of this question that has come to our attention appears in a report by Carolyn M. Johnson, Master in Chancery, in *Heathman v. Owens–Corning Fiberglas Corp.* No. 87–1934 (Dist. Ct. Brazoria Cty. Tx.1989). In that report, she observes:

A comparison of the testimony of Bockstahler with the document shows that the composite knowledge of the Defendant Company is not reflected in Bockstahler's testimony although he is the agent designated by the Company as its representative spokesman. This suggests a number of disturbing possibilities:

(1) The company is **unknowingly** producing a witness who is "sterilized" on the key issues of notice and the company's tests relative to hazards—issues which are basic to a fair determination of the instant lawsuit.

(2) The company is **knowingly** producing such a witness.

(3) The witness, and vicariously the company, is **offering perjured testimony** on behalf of the company.

(4) **Attorneys are shielding the document while permitting the Company's designated witness to give inaccurate and false testimony.**

She then concludes:

a failure to produce the document while allowing a witness to continue to give inaccurate testimony which can be easily corrected and explained by the document effectively distorts the search for truth and constitutes a fraud upon the parties, the witness, and the Court.

*Id.* at 17–19 (emphasis in original). We cannot but agree with the Master in Chancery and conclude that any privilege had been waived long before the onset of this litigation, and that the document and the related Bockstahler testimony should be admitted.

With respect to the remaining documents, each objecting defendant asserts—in one way or another—that the document under attack should be excluded either as "irrelevant" under Federal Rule of Evidence 401 because it has no "tendency to make the existence of any [relevant] fact ... more probable or less probable than it would be without the evidence" or under Rule 403 on the ground that its "probative value is substantially outweighed by the danger of unfair prejudice."

In weighing these contentions, we take into account several considerations. First, a corporation can only act through individuals empowered to act on its behalf. Consequently, before a document can be deemed relevant under Rule 401, there must be some indication that would lead a court to conclude that the document in question had at some time come to the attention of some individual empowered to act. Second, there must be some indication that such individual—*at the time he or she saw the document*—could rationally be assumed to have related it to a potential danger to a person in the decedent's position. Absent these considerations, it clearly would be unfairly prejudicial to permit the plaintiff—in search of punitive damages and other relief—to assail the jury with miscellaneous unrelated warnings of doom accumulating over the life of the defendant corporation.

### The Bureau of Mines Documents

■ According to a letter dated March 11, 1932 from a "Surgeon in Charge" in the U.S. Bureau of Mines Cooperative Clinic in Picher, Oklahoma to the Bureau's Chief Surgeon in Washington, D.C., one Mr. Erban Mabon, Safety Engineer of the defendant Eagle Picher Co., had urgently requested the Bureau to make a safety examination of defendant's plant in Picher. In consequence of this urgent request, the Surgeon in Charge asked the Chief Surgeon to forward the report to the defendant "at the earliest possible date, as they are anxious to receive it."

The letter and the report with its cover letter were found in the National Archives. The report itself states that the defendant's safety engineer had requested the examination in September of the previous year and gives a complete account of the examination and of its recommendations.

It appears from the report that in various locations in the defendant's plant, varying concentrations of dust—including asbestos dust—were found to be circulating. Atmospheric samples revealed dust counts ranging from one million to four billion particles, and three out of four employees examined showed abnormal thickening in the bronchial tubes after short exposures ranging from nine to sixteen months. Based upon this and other data, the report made detailed recommendations for procedures to be adopted to control the dust in each of the separate places it was found to have circulated within the plant. Specifically, the report suggested that machinery be installed in the furnace room to suck the dust from the room or to create an upward system of ventilation, that a dust controlling system be installed in the fabricating room and that the room be kept as open as possible, and that the two men working in the mixing room be replaced by machinery commonly used by cement manufacturers to perform the same kinds of work. To underline the urgency of its recommendations, it pointed out among other things, that "it is now known definitely that asbestos dust is one of the most dangerous dusts to which man is exposed."

We find that the documents clearly satisfy the first requirement, that it be more probable than not that defendant's chief engineer—who clearly had authority to act for the defendant—received the report. There is no basis for assuming that the Chief Surgeon in Washington, D.C. arbitrarily rejected the obviously sound advice of the Surgeon in Charge and declined to forward the report to the defendant which was "very anxious to receive it."

We turn then to the second requirement: whether or not there is any rational basis for believing that Mr. Mabon could, in 1932, have come to the conclusion that asbestos which was then determined to be dangerous to persons exposed to its dust during manufacture would also be dangerous to the users of finished asbestos-containing products. In the first place, we note that the Bureau of Mines (which obviously was aware of the purposes intended for the products being manufactured by the defendant) did not even suggest such a possibility. In the second place, the Bureau never suggested that the defendant discontinue its manufacture of asbestos-containing products, but only that it mechanically control (or reduce incidents of exposure to) the concentration of dust where such products were being manufactured. Furthermore, the year was 1932. We may take judicial notice that then and for many years thereafter, the United States government and countless municipalities—including the City of New York—not only permitted but *required* the use of asbestos products for purposes of insulation. *Cf. Kaufman v. City of New York*, 891 F.2d 446 at 446 (2d Cir.1989).

In light of the foregoing, absent some indication that Mr. Mabon was the "seventh son of a seventh son" or displayed other evidence of supernatural powers, no court or jury could rationally come to the conclusion that he should or even could have foreseen that some years down the pike it would be discovered that asbestos was dangerous not only to those engaged in the manufacture of asbestos products, but also to ultimate users of those products. It would therefore be absurd to permit a jury to award damages—let alone punitive damages—against his employer because of his understandable lack of foresight.

*The Aber Report*

The Aber Report, dated April 8, 1942, is an interoffice communication prepared by one E.M. Aber, a salesman employed by defendant Eagle–Picher. Aber had been sent to Texas to check on an investigation by the Texas State Board of Health into the safety to end-users of a non-asbestos-containing mineral wool product manufactured by defendant. In his report, which instructs that copies be sent to three individuals who have been identified as the general manager, general sales manager, and sales service engineer of defendant's insulation division,[1] Aber detailed

1. Although the report identifies its addressees only by name, their positions have become

what he had learned about the investigation. In addition, he reported that he had read a "very informative" article on the hazards of asbestos and advised how a copy of the article might be obtained. "If you think mineral wool is dangerous," he wrote, "you should read this."

We find that the first requirement—that it be more probable than not that someone empowered to act on defendant's behalf received the report—has been met. Indeed, there is no basis for assuming that the report, which was produced from defendant's files, was not received by the three individuals to whom it was addressed and who, one might expect, anticipated receiving it. Moreover, the individuals to whom Aber was to report the results of this product safety investigation were more likely than not to have been empowered to act in a way that would promote the safety of defendant's products.

We conclude that the second requirement has been satisfied as well: there is sufficient indication that the persons who received the document might have related it to a potential danger to a person in the decedent's position. The very existence of Aber's report reflects defendant's awareness that its mineral wool products might be hazardous to end-users. The contents of the report suggest that defendant's asbestos-containing products might subject them to an even greater danger. In light of the foregoing, we conclude that the Aber Report should be admitted.

### The Harrington Letter

■ In his letter of September 13, 1962, one John Harrington reported to defendant's plant manager about a meeting of contractors he had attended that was in part "devoted to discussing the increasing popularity of claims for asbestosis being made with the Health and Welfare Administration." The letter notes that eighteen workmen's compensation claims had been filed nationwide and that contractor associations had become interested in obtaining information from manufacturers about the

long term effects of their products on end-users.

We find that the letter satisfies both of the above-described requirements. First, there is sufficient indication (and defendant does not dispute) that the letter came to the attention of defendant's plant manager who clearly was empowered to act on its behalf. Second, from the content of the letter—which evidences a growing perception of the hazardousness of long term use of asbestos products—we conclude that there is a rational basis for believing that the defendant's plant manager would have related that perceived danger to someone in the decedent's position, *i.e.* a worker who used defendant's products and/or was constantly in the vicinity of others who did. We therefore deny defendant's motion to exclude the Harrington Letter.

### The Saranac Lake Study Documents

■ The Saranac Lake Study was undertaken by Owens–Illinois to evaluate the hazards of its asbestos-containing product, Kaylo. The study generated reports and correspondence dating from 1941 through 1955. In 1958, Owens–Illinois sold the Kaylo product line to defendant Owens–Corning Fiberglas Corporation ("OCF"). The agreement of sale required Owens–Illinois to deliver to defendant OCF all of its Kaylo files. Defendant asserts, however, that, although it received some documents relating to the Saranac study, the particular documents it now moves to exclude were not among them. To show that defendant received the documents at issue, plaintiff offers only the testimony of one Willis Hazard, an Owens–Illinois officer, who testified that he helped janitors pack the Saranac study files into cartons, but never saw the janitors move them to defendant's offices.

Mr. Hazard's testimony can be reconciled with defendant's position in either of two ways: (a) the person or persons who picked up the cartons, through carelessness or otherwise, delivered one or more of them to an incorrect address; or (b) after all the cartons had been delivered to defendant's

---

known to us through the deposition testimony of Robert Bockstahler which plaintiff's counsel

annexed to his letter to the court dated December 13, 1989.

offices, one or more of them was lost. There is no rational basis for concluding that one of these explanations is more probable than the other. Moreover, even if we were to assume that the documents were actually delivered to defendant and mistakenly misfiled, there would be no basis for a finding that it was more probable than not that they ever came to the attention of anyone authorized to act on defendant's behalf. Thus, we depart from the rulings of Judges Sand, Sifton, and Walker, and join instead with Judges Sweet, Keenan and Kram in excluding the documents.

## CONCLUSION

We grant defendant Eagle Picher's motion to exclude the Bureau of Mines documents, and deny its motions to exclude the Spencer Memorandum (and related Bockstahler testimony), the Aber Report and the Harrington Letter. We grant defendant Owens–Corning Fiberglas' motion to exclude the Saranac Lake Study documents.

SO ORDERED.