**Kenneth BAKER, and Steven Baker, Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No. 91–0991–CV–W–8–BD.**

United States District Court,
W.D. Missouri,
Western Division.

Feb. 19, 1999.

---

13. Documents ZUR 004337–004342, 004917–004922, 005038–005043, 005088–005093, 005206–005211, 05483–05490, 005977–005983.

**378**

J. Kent Emison, Robert L. Langdon, Langdon, Emison, Kuhlman & Evans, LLC, Lexington, MO, Michael West Blanton, The Law Firm of Michael W. Blanton, Blue Springs, MO, for Kenneth Lee Baker, Steven Robert Baker and Melissa Thomas.

John W. Cowden, Baker, Sterchi, Cowden & Rice, Kansas City, MO, Richard W. Shapiro, Phoenix, AZ, Arthur Greenfield, Phoenix, AZ, for General Motors Corporation.

*ORDER*

HAYS, United States Magistrate Judge.

Presently pending before the Court is Plaintiffs' Motion for Sanctions Against General Motors Regarding Edward Ivey and Newly Discovered Evidence (doc # 226), Plaintiffs' Motion for in Camera Review of Document Numbers 233, 224, 216 and 1 Pertaining to Edward Ivey[1] (doc # 224) and Plaintiffs' Motion for in Camera Review of Handwritten Notes of William Cichowski Made on August 29, 1984 (doc # 233). These motions have lead to extensive briefing and an interlocutory appeal to the Eighth Circuit Court of Appeals followed by three days of hearings.[2]

The Court feels compelled to note that the dispute over these five documents has consumed endless amounts of time and has effectively sidetracked this litigation from a retrial until the dispute can be resolved. The five documents at issue are related to another document, the Ivey Analysis, as will be discussed further in this Order. Defendant moved to exclude the Ivey Analysis from the first trial and, in preparation for a retrial, has again filed a motion seeking to exclude it. While it may seem premature for this discussion to take place in advance of the Court's ruling on the admissibility of the Ivey Analysis, the Court feels that the unusual circumstances of this case dictate this procedure. First, the Ivey Analysis was introduced in the first trial. Even if this Court were to make a different ruling than Judge Stevens when it takes up the motion in limine to exclude it, discoverability is far broader than admissibility. Finally, even if this Court were to conclude initially that the Ivey Analysis was excludable during the retrial, plaintiffs would always have the claim that some testimony during the trial opened the door to its admission. Thus, the Court be-

1. At a conference on February 1, 1999, the parties seemed to suggest that this motion was ruled when the District Court granted plaintiffs' request to review the documents in camera. However, the motion also sought the production of the documents following the Court's in camera review; thus, that portion of the motion seeking production of the documents must still be resolved.

2. The hearings were held by the late Honorable Joseph E. Stevens, Jr.

lieves that a determination of the discoverability of the documents at issue is warranted.

## I. PROCEDURAL BACKGROUND OF THE CASE

This is a wrongful death action filed by the children of Beverly Sue Garner as the result of Ms. Garner's death on February 23, 1990. At that time, the decedent was a passenger in a Blazer driven by Gerald Shoemaker when it was struck head-on by another vehicle. Plaintiffs allege that Ms. Garner died as the result of being severely burned in the fire that erupted in the engine compartment following the impact and that General Motors (hereinafter "GM") is responsible for the death of their mother under theories of strict liability, negligence and breach of the implied warranty of fitness.

This case was originally tried in 1993. At that time, as a sanction for GM's failure to comply with discovery orders, Judge Stevens ordered defendant's affirmative defenses stricken and determined that the automobile had a defective fuel pump and that the pump continued to operate after the engine stopped. The jury returned a verdict of $11.3 million in damages. The Court of Appeals, in part, concluded that the discovery violations warranted a sanction, but that the sanction imposed was excessive. *See Baker v. General Motors Corp.*, 86 F.3d 811 (8th Cir.1996). The United States Supreme Court accepted certiorari and reversed on another issue. *See Baker v. General Motors Corp.*, 522 U.S. 222, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998). The case is currently before this Court for retrial. The trial is presently scheduled for March 8, 1999.[3]

The present request for sanctions is unrelated to the earlier request for sanctions (*see* Motion Regarding Appropriate Sanctions for Past Misconduct) which has not yet been decided. This order discusses only plaintiffs' request that GM be sanctioned for conduct

which plaintiffs allege they have discovered only recently and which was not at issue in the first trial. The Court viewed plaintiffs' sanction motion as being premised on the Court granting defense counsels' request that it order GM to produce certain documents.[4] For it is these documents upon which plaintiffs rely, in part, to show sanctionable conduct by GM and its attorneys. GM contends the documents at issue are protected by the attorney-client privilege and the work product doctrine. Plaintiffs argue that the documents are not privileged, that they have shown substantial need for any documents protected by the work product doctrine and that any attorney-client privileges have been vitiated by the crime fraud exception.

The Eighth Circuit's mandamus order, *In re General Motors Corp.*, 153 F.3d 714 (8th Cir.1998), addressed the proper procedures for the District Court to follow in considering the crime fraud exception to materials for which an attorney-client privilege claim is asserted. However, before considering whether the documents at issue fall within the crime fraud exception, the Court must first consider the nature of the document, the type of privilege(s) claimed and whether the party asserting a privilege has satisfied its burden of establishing that a particular document is subject to some type of privilege. Only if the Court finds that a document is subject to the attorney-client privilege and that there has been no waiver of the privilege, should the Court consider whether the document is producible under a crime fraud theory. Moreover, GM also claims that the work product doctrine prevents the production of the materials in question.

The initial inquiry for the Court is whether the documents at issue should be produced to plaintiffs in whole or in part.

---

**3.** The earlier August trial setting was postponed due to the mandamus proceeding filed by GM in connection with issues raised by the motions at issue in this Order.

**4.** During oral argument on February 9, 1999, plaintiffs argued that the motion for sanctions was not based upon the production of privileged

documents, but rather on a comparison of Mr. Ivey's trial testimony in *Baker* and deposition testimony in other cases. (Tr. at 125–126) However, the analysis presented by plaintiffs in their motion for sanctions involves a comparison of Ivey's trial testimony with statements contained in the 1981 and 1983 interviews of Ivey.

## II. *PRODUCTION OF DOCUMENTS*

The undersigned has only recently been assigned to this case. However, counsel has met with the parties, held argument and reviewed all briefs, including the unredacted versions, and all in camera filings. Plaintiffs originally sought production of documents 233, 224, 216 and 1. Plaintiffs later filed a motion for review of the handwritten notes of William Cichowski. Plaintiffs maintain they do not need to compel the production of documents 210 and 213, as they are currently in possession of these documents having retrieved them from the Internet. In his July 1, 1998 ruling, Judge Stevens concluded that documents 1, 210A[5] and 216 were not relevant to plaintiffs' contentions and that no further briefing or submissions on these documents were required. (*See* July 1, 1998 Order (# 262) at 6) Plaintiffs have not asked the Court to reconsider this ruling. Thus, of the documents initially sought by plaintiffs, only documents 233, 224 and the handwritten notes of William Cichowski are at issue.

In connection with his rulings on the application of the crime fraud exception to the attorney-client privilege, Judge Stevens relied upon documents 210 and 213. Judge Stevens' opinion of July 1 was presented to the Eighth Circuit by way of a petition for mandamus. In discussing the proper procedures for evaluating the crime fraud issues, Judge Hansen, in a concurring opinion, stated that "the better practice would have been for the district court to have made its own determination about whether or not Documents 210 and 213 are privileged before it made its threshold determination." *In re General Motors Corp.*, 153 F.3d 714, 717 (8th Cir.1998). *See also* the comments of the Court at 716 n. 3. The undersigned believes these comments warrant a reevaluation of the status of documents 210 and 213, particularly because there is no indication that the District Court ever addressed the issue of whether documents 210 and 213 were privi-

leged. Moreover, despite plaintiffs' current access to these documents, the Court would ultimately have to address the privilege issue when plaintiffs attempted to use the documents at trial. Thus, GM's claims of privilege will be evaluated in connection with documents 210 and 213, in addition to documents 233, 224 and the handwritten notes of William Cichowski.

GM has submitted a privilege log which indicates the following privileges are claimed:

1. 210—attorney-client communication; attorney work product;

2. 213—attorney work product;

3. 224—attorney-client communication; attorney work product;

4. 233—attorney-client communication; attorney work product; and

5. Cichowski notes—attorney work product.

During the February 9, 1999 hearing, plaintiffs' counsel indicated that during the September hearings, they learned of other notes reflecting interviews with Mr. Ivey, including Exhibit 30, Don Howard's notes from a November 3, 1981 interview; Exhibit 29, W.R. Davis' notes from a November 3, 1981 interview; and Exhibit 32, David Graves' notes of a meeting with Edward Ivey on August 16, 1983.[6] Plaintiffs seek production of these additional documents. GM submitted an updated privilege log in October of 1998 claiming the following privileges:

6. 29–A/C/WP;

7. 30–A/C/WP; and

8. 32–A/C/WP.

GM claims that each of the documents is protected from discovery as attorney work product. Thus, the Court will examine this issue first and then turn to the issue of the attorney-client privilege asserted for documents 29, 30, 32, 210, 224 and 233.

---

**5.** Document 210A, also marked at the in camera hearings as document 31, is a compilation of a number of witness interviews. Document 210, a typed version of Don Howard's interview of Edward Ivey, is one of the interviews contained in document 210A. It should be noted that Mr. Howard is now deceased.

**6.** Mr. Kemp and Mr. Howard were present at this meeting. Mr. Kemp's notes are exhibit 213. Mr. Kemp testified he was unaware of any notes of Mr. Howard from this meeting. Tr. of Closed Proceeding at 140.

## A. *Work Product Doctrine*

Rule 501 of the Federal Rules of Evidence provides that state law privileges are to be applied by a federal court in a diversity action. However, many courts have concluded that the work product doctrine is not a substantive privilege within the meaning of Rule 501, describing the doctrine as "a tool of judicial fairness, borne out of concerns over fairness and convenience and designed to safeguard the adversarial system." *Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Cos.,* 123 F.R.D. 198, 201 (M.D.N.C.1988). Thus, the Court will apply federal law, that is, Rule 26(b)(3) in evaluating whether the documents at issue are protected by the work product doctrine. *See Airheart v. Chicago & North Western Transp. Co.,* 128 F.R.D. 669 (D.S.D.1989). *See also In re Combustion, Inc.,* 161 F.R.D. 51, 52 (W.D.La. 1995), *aff'd,* 161 F.R.D. 54 (W.D.La.1995), and cases cited therein.

Rule 26(b)(3) of the Federal Rules of Civil Procedure provides:

**Trial Preparation: Materials.** Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant ...) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

As the following analysis demonstrates, there does not appear to be a dispute that the documents in question were prepared by agents of defendant GM, specifically its attorneys and a consulting engineer, and that they were prepared in anticipation of litigation.

***Documents 210 and 30:*** The privilege logs submitted by GM indicate that document 210, a typed memorandum, was prepared by Don Howard, an attorney at Strasburger & Price, on November 3, 1981. Document 210 is a typed summary of an interview of Ed Ivey and is described by GM as consisting of the attorney's thoughts, mental impressions and opinions concerning the interview. At the closed session before Judge Stevens, Mr. Howard's handwritten notes, which formed the basis for the typed version, were introduced as Exhibit 30. The notes, as well as the memorandum, were alleged to have been prepared as a result of already pending, as well as future, litigation and the typed version was alleged to have been communicated to GM for the purpose of providing legal advice.

***Document 29:*** Mr. Davis, a partner at Strasburger & Price, who was also present during the 1981 interview of Mr. Ivey, testified at the closed hearing before Judge Stevens that litigation was already pending at the time of this interview. (*See* Tr. of Proceedings of Closed Session at 38) Mr. Davis' notes of the 1981 interview were introduced as Exhibit 29.

***Document 213:*** Defense counsel stated in exhibit 14, the privilege log, that this document is attorney work product in that it contains the confidential notes of a GM legal staff attorney, William Kemp, prepared in connection with pending and anticipated litigation and that it reflects thoughts, mental impressions and commentary about a potential witness. The Kemp notes were made during an interview of Mr. Ivey on August 16, 1983.

***Document 32:*** These are the notes of David Graves, an attorney with a Minneapolis law firm, taken during a meeting with Edward Ivey on August 16, 1983. William Kemp was also present during this meeting; his notes, exhibit 213, are also at issue. The meeting was held in connection with pending litigation. Counsel stated that he treated the notes as privileged attorney work product material. (Tr. of closed session at 98–106)

**Document 224:** This document is a memorandum to file prepared by Philip E. Holladay, Jr., an attorney with King and Spaulding, on May 6, 1991, that was copied to other attorneys at King and Spaulding and the legal assistant. The document summarizes Mr. Holladay's perceptions of a deposition given by Mr. Ivey in the *Moseley v. GM* case where GM was represented by Mr. Holladay.

**Document 233:** This is described in the privilege log as a 1989 revision of a 1982 confidential memorandum prepared by GM's outside counsel, Winston and Strawn, for the GM Legal Staff conveying attorneys' thoughts, mental impressions, opinions and legal advice regarding analysis of evidence and case preparation. The Court's review of the document suggests that it was an effort by counsel to summarize all pertinent documents on particular topics that counsel had reviewed through a certain date.

**Cichowski Notes:** Mr. Cichowski was a GM engineer, now retired, who along with counsel, met with Mr. Ivey on August 29, 1984 and took notes at the interview. Mr. Cichowski's affidavit indicates that he assisted GM in various aspects of defending litigation. Further, he states that he kept the notes in his possession while employed at GM and that he took the notes along with other personal papers when he left GM in 1992. (Exh. 28)

These summaries clearly indicate that all of the documents were prepared as the result of existing and anticipated litigation.

### 1. *Substantial Need/Undue Hardship/Substantial Equivalent*

▮ Plaintiffs contend that the work product doctrine should not prevent disclosure of the documents in the circumstances of this case because plaintiffs have substantial need for the documents and an inability to obtain the equivalent information elsewhere. (*See* Plaintiffs' Response at Ex. A, pp. 11–15)[7] Plaintiffs contend that the information contained in these documents is relevant to the Ivey Analysis, a document which, according

to plaintiffs, was an important component of the case as tried in 1993. (*Id.* at 13) What has come to be referred to by the parties as the Ivey Analysis is a document generated by Edward Ivey on June 29, 1973, entitled Value Analysis of Auto Fuel Fed Fire Related Fatalities. Pursuant to a formula set forth in the document, Ivey concludes that "fatalities related to accidents with fuel fed fires are costing General Motors $2.40 per automobile in current operation," (*See* Def. Ex. 6 to September hearings) The document further states that "[t]his analysis indicates that for G.M. it would be worth approximately $2.20 per new model auto to prevent fuel fed fire in *all* accidents." (*Id.*) The parties differ significantly in their interpretation of the import and meaning of this analysis.

Prior to the start of the first trial, GM tried to exclude the Ivey Analysis arguing, in part, that:

> At that time, Mr. Ivey was just above an entry level engineer at General Motors. He apparently prepared the document on his own initiative. No General Motors employee requested that he prepare the document, and he did not disseminate it to anyone at General Motors. General Motors has never adopted its contents or used it for any purpose.

(Plaintiffs' Hearing Brief re: Ivey Value Analysis at Ex. 10) GM makes this same factual contention in the pending Motion in Limine to Exclude the Ivey Document (# 313). Plaintiffs contend that GM has in fact suggested that the Ivey analysis was simply an individual intellectual exercise that Ivey performed on his own. *Id.* at 13–14. In the pending Motion in Limine, GM also argues that Rule 403 of the Federal Rules of Evidence precludes the introduction of this document at trial. In part, GM contends that:

> If this document is entered into evidence, the jurors could be led to conclude that it somehow reflects General Motors' assumptions, conclusions or views concerning the Blazer's design. This is not the case. GM

---

7. Plaintiffs' Response to Defendant General Motor's Memorandum of Law Regarding GM's Proposed Findings of Fact and Conclusions of Law Related to the Crime/Fraud Hearing at Ex. A

(Plaintiffs' Brief Regarding Appropriate Sanctions and Application of the Attorney–Client Privilege and the Work Product Doctrine)

did not request or authorize the document's preparation; and never used it or the information within it.

(GM's Motion in Limine at 9)

The Court has reviewed the motions in limine and the complete transcript of Ivey's testimony during the first trial. (Trial Transcript, Vol. VIII at 1466–92) Mr. Ivey testified in 1993 that no one at GM asked him to prepare the Value Analysis, that it was not sent to anyone and that he did not use it in his work. (*Id.* at 1474–75)

Plaintiffs seek the requested documents so that the information contained therein may be used as support for their Motion for Sanctions. However, it is apparent that the documents would be useful at trial for the purpose of impeaching Mr. Ivey's testimony concerning the Value Analysis. Plaintiffs' position is that in statements taken much closer in time to the preparation of the document, the witness indicated a different recollection about why the Value Analysis was prepared and to whom it was sent. The Court has reviewed the documents which were submitted to the Court in camera and finds that *factual information* is contained in certain of the documents which might allow plaintiffs' counsel to either refresh Mr. Ivey's recollection or to impeach his prior testimony.

Plaintiffs maintain that Mr. Ivey has given deposition testimony at variance with his *Baker* trial testimony. However, in none of his testimony has Mr. Ivey ever suggested that GM may have asked him to prepare the Value Analysis or that it may have been circulated to others at GM. Given Mr. Ivey's unequivocal testimony at the prior trial and his lack of recollection in depositions, it would appear that defense counsel would be unable to refresh the witness' recollection about prior statements from other documents that are of public record.[8]

The Court finds that this showing demonstrates substantial need for certain of the documents within the meaning of Rule 26(b)(3) of the Federal Rules of Civil Procedure. This finding is well supported by the case law. The United States Supreme Court first recognized that work product documents which might contain impeachment material should be produced in *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the case on which Rule 26(b)(3) is based. Since that time, courts have frequently ordered disclosure of work product materials containing facts that might be relevant for impeachment at trial. *See Duck v. Warren,* 160 F.R.D. 80, 82–83 (E.D.Va.1995); 8 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2025 (1994).

The rule also requires that a party be unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. The above discussion also demonstrates plaintiffs' inability to obtain information from a witness merely by taking his deposition or propounding interrogatories to counsel for GM. Moreover, the fact that some of the documents under discussion have already appeared on the Internet does not satisfy the requirement that the same or similar material be available by other means, since ultimately this Court will have to decide what information can be used at trial and as evidence in support of motions.

Not all of the documents contain factual materials which defense counsel would be unable to obtain without undue hardship by other means. For example, document 224, is a summary of Mr. Ivey's deposition in a pending case. There has been no argument that this deposition would be unavailable to plaintiffs. Moreover, plaintiffs' counsel would be in as good a position as Mr. Holladay to summarize the deposition and evaluate how it went. Moreover, as will be discussed in the following section, this document would seem to be almost entirely opinion work product. Likewise, document 233 is counsel's attempt to summarize all of the documents they had reviewed on a particular topic. Again, there has been no claim that the documents are unavailable to plaintiffs or

---

8. Even though the documents were not created by this witness, they can be shown to the witness in an effort to refresh his memory and, if witnesses to whom the statements were made are called as witnesses at trial, the statements, written or oral, may be used in accordance with Rule 613 of the Federal Rules of Evidence.

that plaintiffs would be unable to prepare their own summaries of such documents. Like document 224, document 233 would appear to be opinion work product.

The Court concludes that a showing of substantial need and inability to obtain equivalent factual information without undue hardship has been demonstrated with regard to documents 29, 30, 32, 210 and 213 and the Cichowski notes. The Court will next examine the special protection afforded to opinion work product.

### 2. *Mental Impressions Of Counsel*

Rule 26(b)(3) provides that in ordering disclosure of materials where the requisite showing has been made, the Court "shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Pursuant to this provision, the cases make a distinction between factual work product and an attorney's mental impressions or opinions. Whether the protection for opinion work product is absolute and never subject to disclosure or almost never subject to disclosure has been widely debated by the commentators and the case law. *See Smith v. Diamond Offshore Drilling, Inc.*, 168 F.R.D. 582, 585 (S.D.Tex.1996); Wright and Miller at § 2026. This debate over absolute versus near absolute immunity would seem to be an academic question that need not be resolved at the present stage of the proceedings. However, the Court is not foreclosing the possibility that opinion work product might be producible in connection with Plaintiffs' Motion for Sanctions, which raises issues concerning the conduct of counsel. However, resolution of that issue can be deferred until after the trial of this matter as will be explained in Section III of this opinion. For purposes of pretrial preparation and examining witnesses at trial, even in the circumstances of this case, the Court cannot conclude that plaintiffs are entitled to opinion, as opposed to fact, work product.

■ However, it appears that the Court and GM may differ significantly over what is encompassed by opinion work product. When asked about his notes of the interview of Mr. Ivey, Mr. Davis, in the closed session, testified that they included his mental impressions and he went on to state that "I think what you write down are mental impressions of what you are doing." (Tr. of Proceedings of Closed Session at 39) To the extent that GM is claiming that merely because an attorney recorded a fact, it is opinion work product, the Court rejects GM's position. The Court, however, does concur with GM that documents 224 and 233 are almost exclusively opinion work product. Moreover, the underlying documents discussed by counsel in these memoranda are available and subject to review, if requested and if relevant. However, *facts* given by an employee to an attorney do not fall within the category of opinion work product entitled to absolute or near absolute protection. Thus, factual materials contained in documents are not shielded from disclosure by the work product doctrine in the circumstances of this case and will be ordered to be produced by GM unless they are protected from disclosure by the attorney-client privilege.

The attorney-client privilege has been claimed as to documents 29, 30, 32, 210, 224 and 233, but not document 213 or the Cichowski notes. GM claimed at the February 9, 1999 argument that it had intended to assert the attorney-client privilege for document 213 and that in briefings and hearings it has always treated the document as subject to the attorney-client privilege. The starting point for this Court's analysis was the privilege log first produced on July 6, 1998 (# 261). The document was marked as Exhibit 14 at the September hearings and is an exhibit in five separate hearing notebooks. The Court should be entitled to rely on the privilege log as it did in this case. While of the opinion that GM may have waived the attorney-client privilege as to document 213, the Court will examine that claim since document 213, like documents 29, 30 and 32, contains notes of an attorney's interview of Mr. Ivey. Thus, the Court will examine this privilege in relation to documents 29, 30, 32, 210, 213, 224 and 233.

## B. *Attorney–Client Privilege*

### 1. *Choice Of Law Issues*

The parties are in agreement that when a federal court sits in a diversity case, privilege issues axe determined by "State law." *See* Rule 501, Federal Rules of Evidence. Before the Court can determine the elements of the attorney-client privilege and whether the privilege has been waived, it must first determine which State's law applies. The briefing of the parties assumes that the Missouri law on attorney-client privilege will be applied to all of the documents at issue, even though it appears that none of the documents were created in Missouri. However, Missouri's only connection to the documents at issue is that plaintiff seeks to use them in litigation pending in federal court in Missouri.

During oral argument on February 9, 1999, defendant cited *Pritchard–Keang Nam Corp. v. Jaworski*, 751 F.2d 277 (8th Cir. 1984), *cert. dismissed*, 472 U.S. 1022, 105 S.Ct. 3491, 87 L.Ed.2d 625 (1985), for the proposition that because Missouri state courts have never addressed the choice of law with respect to attorney-client privileges, the Eighth Circuit would apply Missouri case law holding that the law of the forum governs. (Tr. at 54) The Court has reviewed the *Pritchard–Keang Nam Corp.* case, and while it is instructive on several issues, the opinion does not resolve the conflict of law issue in this case. In *Pritchard–Keang Nam Corp.*, the issue presented to the Eighth Circuit was whether the crime-fraud exception to the attorney-client privilege applied to a report prepared by a corporation. The court noted that the threshold question was the choice of law, but concluded that it was "unnecessary to resolve this issue." 751 F.2d at 280. In a footnote, the Eighth Circuit recognized that in a diversity case, privileges are determined according to the state law that supplies the

rule of decision and that when a case is brought in Missouri, Missouri choice of law rules apply. *Id.* at 280 n. 4. At the time *Pritchard–Keang Nam Corp.* was decided, the Eighth Circuit indicated that no Missouri court had decided upon the applicable choice of law rule in the context of attorney-client privileges.[9] *Id.* The court then suggested that determining whether a prima facia showing of fraud had been made for purposes of the crime-fraud exception may be a procedural matter governed by federal law. *Id.* During the February 9, 1999 argument, defense counsel stated that the Missouri state courts have still not decided the choice of law issue in the context of the attorney-client privilege. However, in the context of other conflicts issues, Missouri courts have not hesitated to rely upon the Restatement (Second) of Conflict of Laws. *See Farmers Ins. Co. v. McFarland*, 1998 WL 548738 (Mo. Ct.App. Sept.1, 1998) (stating "significant relationship" test which is found in Section 145 of Restatement (Second) of Conflict of Laws has not only been adopted in Missouri for tort actions, but for contract actions as well); *Atlas Intermodal Trucking Serv., Inc. v. United Fire & Casualty Co.*, 973 S.W.2d 174, 177 (Mo.Ct.App.1998) (stating that Missouri has adopted Sections 188 and 193 of Restatement (Second) of Conflict of Laws in deciding choice of law issues regarding insurance contracts); *CMT Partners v. Alaiwat*, 969 S.W.2d 885, 887 (Mo.Ct.App.1998) ("When determining choice of law issues, Missouri courts apply the 'most significant relationship' test set out in Section 188 of the Restatement (Second) of Conflict of Laws.")

Section 138 of the Restatement (Second) of Conflict of Laws provides that the local law of the forum determines the admissibility of evidence, except as stated in sections dealing with privileged communications, parole evidence and the statute of frauds.[10] Section

---

9. In *Pritchard–Keang Nam Corp.*, the Eighth Circuit referred to the Missouri Supreme Court's decision in *Rosser v. Standard Milling Co.*, 312 S.W.2d 106 (Mo.1958). However, that decision dealt with the question of what evidence is admissible to establish the fact and scope of an employee's agency.

10. The position set forth in Section 138 of the Restatement (Second) of Conflict of Laws is en-

tirely consistent with the court's approach in *Rosser* where the court concluded that admissibility was determined by the local law of the forum. Significantly, in *Rosser*, none of the exceptions recognized by the Restatement (Second) of Conflict of Laws for privileged communications, parole evidence or the statute of frauds was at issue.

139, dealing with privileged communications, provides that:

(1) Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum.

(2) Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.

Restatement (Second) of Conflict of Laws at § 139.

In this case, Michigan obviously has an interest in seeing that privileges for attorney-client communications taking place in that state are recognized elsewhere. *See Ford Motor Co. v. Leggat,* 904 S.W.2d 643, 646–48 (Tex.1995). However, even if the communication occurring in Michigan were privileged under that state's law, plaintiffs contend that the privilege has been waived, in part, because of conduct and representations of defendant in this Court. Missouri, thus, has a strong interest in insuring that conduct occurring in a Missouri forum is treated uniformly.

Thus far, counsel have not suggested that Michigan and Missouri law differ significantly in either the extent of the privilege recognized or the manner in which it can be waived. Frequently, courts that have been confronted with a choice of law question in the context of an attorney-client privilege claim have concluded that it is not necessary to resolve the issue because the law of the two states does not differ significantly. *See In re Ford Motor Co.,* 110 F.3d 954, 965 (3rd Cir.1997). Thus, in analyzing the existence of the privilege and whether any waiver has occurred, the Court will rely on both Michigan and Missouri precedent and will attempt

to note any differences that might be outcome determinative.

2. *Elements Of The Attorney–Client Privilege*

■ Rule 501 of the Michigan Rules of Evidence provides that "[p]rivilege is governed by the common law, except as modified by statute or court rule." The scope of the privilege is described by the Michigan courts as narrow, applying only to confidential communications by a client to his advisor that are made for the purpose of obtaining legal advice. *See Reed Dairy Farm v. Consumers Power Co.,* 227 Mich.App. 614, 576 N.W.2d 709, 711 (1998); *Fruehauf Trailer Corp. v. Hagelthorn,* 208 Mich.App. 447, 528 N.W.2d 778 (1995), *appeal denied,* 450 Mich. 929, 543 N.W.2d 314 (1995). Michigan law has repeatedly recognized that a communication cannot be treated as confidential if it is made for the purpose of disclosure to third parties. *See Yates v. Keane,* 184 Mich.App. 80, 457 N.W.2d 693, 695 (1990), *appeal denied,* 437 Mich. 986, 470 N.W.2d 372 (1991); *Owen v. Birmingham Fed. Sav. & Loan Ass'n,* 27 Mich.App. 148, 183 N.W.2d 403, 408 (1970).

■ Likewise, Missouri courts have found that the codification of the attorney-client privilege at Section 491.060,[11] Mo.Rev.Stat., is declaratory of the common law rule on attorney-client privilege. *See State ex rel. Great Am. Ins. Co. v. Smith,* 574 S.W.2d 379, 382 (Mo.1978) (en banc) ("the statute does not limit or diminish the common law rule"); *State v. Smith,* 979 S.W.2d 215, 219 (Mo.Ct. App.1998). In order for the privilege to apply, all four of the following elements must be present:

(1) information transmitted by voluntary act of disclosure;

(2) between a client and his lawyer;

(3) in confidence; and

(4) by a means which, so far as a client is aware, discloses the information to no third parties other than those reasonably necessary for the transmission of the informa-

---

**11.** Section 491.060(3) provides: "The following persons shall be incompetent to testify: ... (3) An attorney, concerning any communication made to him by his client in that relation, or his advice thereon, without the consent of such client."

tion or for the accomplishment of the purpose for which it is to be transmitted. *State v. Longo,* 789 S.W.2d 812, 815 (Mo.Ct. App.1990).

It was apparent from the testimony of GM's attorneys during the September 1998 hearings before Judge Stevens that product cases alleging design defects of fuel systems in cars and trucks were already pending at the time of the first Ivey interview in 1981. (*See* David Graves' open session testimony at 10) The information before the Court suggests that Mr. Ivey may have been interviewed so that counsel could respond to discovery requests in pending cases. When GM received the first interrogatories or requests for production of documents that would have called for counsel to have provided factual information gained from Mr. Ivey is unclear. Exhibits introduced at the September hearing suggest that the plaintiff's motion for production of documents in the case of *Swanic v. GM* was noticed for a hearing on December 17, 1982 (Pl.Ex.32), that the court ordered production of documents on March 3, 1983 (Pl.Ex.31) and that the Ivey Analysis was produced on March 17, 1983 (Pl.Ex.34). The Court has not seen any indication that the Ivey Analysis was produced prior to March 17, 1983, but when information concerning the type of document prepared by Mr. Ivey was first requested by plaintiffs is unclear.

However, even GM apparently recognizes that Mr. Ivey was interviewed, in part, so that GM could respond to discovery. In Proposed Findings of Fact Nos. 29 and 30,[12] GM asks the Court to make the following findings:

29. Mr. Davis and Don Howard, one of his associates, interviewed Mr. Ed Ivey about the Ivey Memo on November 3, 1981. No one else was present at the interview besides Mssrs. Davis, Howard, and Ivey. (Testimony of R. Davis, Closed Proceedings, at 34.)

30. Mr. Davis and Mr. Howard conducted this interview for GM to gather informa-

tion for General Motors about the history of the manufacture of the automobile fuel tank. They thought it necessary to collect this information for General Motors *to be able to respond to discovery* and to determine Mr. Ivey's potential strengths and weaknesses as a witness in ongoing and anticipated litigation. (Testimony of R. Davis, Closed Proceedings, at 35.)

(emphasis added) To the extent factual information provided by Mr. Ivey was intended to be incorporated into responses to plaintiffs' interrogatories or requests for production of documents, the Court questions whether that factual information would be protected. Defendant makes a distinction between facts and the communication that contains the facts. However, there is no indication that the handwritten notes, documents 29, 30 and 32, were ever sent or intended to be sent to the client.[13] As noted previously, information that is gathered with the intent that it be disclosed to third parties is probably not a confidential communication.

These issues suggest that defendant may not have clearly established the confidential nature of the communications with respect to documents 29, 30, 32, 210 and 213. It is up to the party asserting a privilege to establish that the privilege applies. *See In re Grand Jury Proceedings,* 655 F.2d 882, 887 (8th Cir.1981) ("The burden is on the party asserting a privilege to establish it."); *Ryobi N. Am., Inc. v. Union Elec. Co.,* 7 F.Supp.2d 1019, 1020 (E.D.Mo.1998) ("The party asserting the privilege has the burden of showing that the communication meets the requirements for the privilege.") However, the Court concludes that further analysis will demonstrate that any privilege that was claimed and established by GM with respect to these notes has been waived. Thus, the Court need not decide whether, in the context of these cases, GM has established that factual information provided by Edward Ivey to attorneys and the attorneys' notes reflecting those facts are subject to the attorney-client privilege. The other documents, docu-

---

**12.** Defendant General Motors Corporation's Proposed Findings of Fact Related to the September 11, 14, and 15, 1998 Evidentiary Hearing (unredacted).

**13.** Document 213 is the handwritten notes of GM's in-house counsel.

ments 224 and 233, are attorneys' summaries of documents transmitted to the client presumably as part of the attorneys' advice and litigation strategy. These documents would seem to meet the requirements for attorney-client privileged materials.

### 3. *Implied Waiver*

Both Missouri and Michigan law recognize that the attorney-client privilege may be waived by conduct that would make it unfair for the holder to insist on the privilege thereafter. *See Howe v. Detroit Free Press, Inc.*, 440 Mich. 203, 487 N.W.2d 374 (1992) (court cites with approval waiver of attorney-client privilege in other courts); *State v. Timmons*, 956 S.W.2d 277, 285 (Mo. Ct.App.1997); *Sappington v. Miller*, 821 S.W.2d 901, 904 (Mo.Ct.App.1992). Implied waiver, also know as "at issue" waiver, occurs when the client places the subject matter of the privileged communication at issue in the litigation. *See Timmons*, 956 S.W.2d at 285; *Sappington*, 821 S.W.2d at 904.

Implied waiver has several common characteristics: the litigant asserting the privilege must place the allegedly privileged communication at issue through an affirmative act such as raising an affirmative defense, thereby making the protected communication relevant and necessary to the original claim of the adversary. *See Worthington v. Endee*, 177 F.R.D. 113, 116 (N.D.N.Y.1998); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir.), *cert. denied*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991) (citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.Wash.1975)); *Peterson v. Wallace Computer Servs., Inc.*, 984 F.Supp. 821 (D.Vt.1997) (privilege may be waived when a party asserts a claim that in fairness requires examination of protected communications).

The rationale for the implied waiver doctrine is that abuse of the attorney-client privilege must not be tolerated. Waiver is predicated on conduct which "places the claimant in such a position with reference to the evidence, that it would be unfair and inconsistent to permit retention of the privilege." 8 J. Wigmore, Evidence § 2388 at 855. The privilege cannot be used both as a

sword and as a shield. *See United States v. Workman*, 138 F.3d 1261, 1264 (8th Cir. 1998); *Howe v. Detroit Free Press, Inc.*, 440 Mich. 203, 487 N.W.2d 374, 379 (1992). GM contends that it has always used its privilege as a shield and never as a sword and that there is no "at issue" waiver in this case because GM has never placed the subject matter of those communications or impressions at issue. (Defendant General Motors Corporation's Memorandum Following the Hearing Before the Court on February 9, 1999 at 5–6) GM further argues that it has always relied exclusively on testimony and exhibits available and discoverable by plaintiffs in making its arguments concerning the Ivey documents. (*Id.* at 6) Contrary to the position taken by GM, the Court believes that GM has placed the facts conveyed by Mr. Ivey to GM's lawyers at issue as well as the notes reflecting those communications.

Prior to the first Baker trial in August of 1993, GM filed its Motion in Limine to Exclude the "Ivey Document." In that motion, counsel for GM argued that the document was not relevant, contained inadmissible hearsay and that the prejudicial impact far outweighed any probative value under Rule 403 of the Federal Rules of Evidence. GM provided the following "facts" to the court. At the time Mr. Ivey prepared the analysis, he was just above an entry level engineer:

> He apparently prepared the document on his own initiative. No General Motors employee requested that he prepare the document, and he did not disseminate it to anyone at General Motors. General Motors has never adopted its contents or used it for any purpose.

(Motion in Limine at 1–2)

In arguing that the document had no relevance under Rule 401, defense counsel argued that the data contained therein related only to passenger cars, that the source of the government statistics was unknown and that there had been no showing the assumptions in the document were accurate. In further support of this argument, GM stated again:

> The document was generated by Mr. Ivey on his own initiative, and he never showed the results reflected in the document to

anyone at General Motors. Indeed, Mr. Ivey has testified that he did not disseminate the document to anyone. It was rather, simply an individual intellectual exercise performed on his own. Plaintiffs cannot provide *any* evidence that General Motors ever assigned, approved or adopted this document. The *only* evidence is that the document was prepared by a near-entry level engineer, on his own initiative, and was not disseminated to anyone at General Motors. Thus, the document has no relevance in this case, and should be excluded from evidence.

(Motion in Limine at 4–5)

In arguing that the document should be excluded under Rule 403, GM asserted that the document can only serve one purpose, "to inflame the jury's emotions against General Motors." (Motion in Limine at 6) GM further maintained that if the document were entered into evidence, the jurors could conclude that it somehow reflected GM's assumptions, conclusions or views. GM then again reiterated:

General Motors did not request or authorize the document's preparation, and never used it or the information in it. The document has never played any factor in General Motor's business decision. To allow the jury to improperly associate the document with General Motors, when in fact no association exits, would be highly and unfairly prejudicial to General Motors.

(Motion in Limine at 6–7) An almost identical motion in limine has now been filed by GM seeking to have the Ivey Analysis excluded during the retrial.

In support of their position, defense counsel argue that plaintiffs can produce no evidence that GM ever assigned Mr. Ivey the task of preparing the document nor can they show that it was disseminated to anyone. Ironically, some of the only information that plaintiffs could rely on to refute GM's representations appear in handwritten notes and one typed summary thereof of GM attorneys who had interviewed Mr. Ivey in 1981 and 1983 and had noted facts that contradict defendant's characterization of the document. For example, interviews between counsel for GM and Mr. Ivey have lead to notes being made by counsel suggesting that the report was written for "Oldsmobile management," and that although Mr. Ivey could not specifically recall, that he believed the report was submitted to Mutty at Mutty's request, that he probably circulated copies of the report to Mutty, Benner, Ball, Perkinds, Wallace and possibly Ridenour, and that he did not do it on his own. Further, the notes reflect that counsel for GM were told his purpose was "how much money GM could spend on each car to prevent it." GM argues that the notes contain speculation and there is nothing inconsistent between these notes and Mr. Ivey's testimony. However, even assuming that the notes reveal that Mr. Ivey was speculating as to exactly who asked him to prepare the report and to whom precisely it was sent, there is a strong suggestion in the notes that in 1981 and 1983, Mr. Ivey told attorneys for GM he prepared the report for Oldsmobile management and that it was circulated to someone at GM. There is no suggestion in the notes that this was an intellectual exercise he did on his own.

Mr. Howard's notes were typed up and circulated to GM's in-house legal staff as well as to attorneys participating in the Regional Counsel Project. Plaintiffs point out that Mr. Bowman and Mr. Kelly, trial counsel during the first trial who argued the original motion in limine in the *Baker* case, were involved in the Regional Counsel Project as was Mr. Greenfield, one of the lawyers currently representing GM. (*See* Plaintiffs' Hearing Brief Re: Ivey Analysis (doc # 378) at Ex. 2) Mr. Kemp was an in-house lawyer at GM when he met with Mr. Ivey. Other notes were made by David Graves (Def.Ex.32), Don Howard (Def.Ex.30) and Richard Davis (Def.Ex.29).

Plaintiffs maintain that counsel for GM were in possession of facts that are contrary to representations made by GM's counsel to the Court in the first motion in limine in this case, as well as the pending motion. Further, plaintiffs' counsel contend that until the *Baker* case, Mr. Ivey had consistently testified to a lack of memory about the 1973 document, and that even today Mr. Ivey has never testified to any of the facts he provided to GM's attorneys in his initial interviews.

(*See* the summary of various testimony and affidavits of Mr. Ivey set forth in a document presented to the Court at the February 9, 1999 hearing)

The testimony given by Mr. Ivey at the first *Baker* trial must be considered in context. During their case-in-chief, plaintiffs presented the testimony of Ronald E. Elwell, who was a GM employee from 1959 until 1986. After 1986, Mr. Elwell consulted as an expert for GM until 1991. Mr. Elwell testified that the Value Analysis, the document created by Ivey, was circulated among persons at GM who were in charge of fuel system integrity, including Stemple, Ridenour, Mutty, Dorshamer and Theland. (Vol. III of Trial Transcript at 402, 404) Mr. Elwell testified that he became aware of the Ivey Analysis in 1981 [14] when it was sent to him with some other documents from Mr. Ridenour's desk. Mr. Ridenour had recently retired and in cleaning out his desk this document was located. (*Id.* at 411–12) Mr. Elwell testified that at that time, there was a cover sheet with the Oldsmobile logo and a list of individuals who were to receive it. Mr. Elwell testified that upon receiving the document, he notified the legal staff because they had been inadvertently telling people that there was no such document. He further indicated that Mr. Ridenour had been asked repeatedly to look for Oldsmobile Division documents. Therefore, Mr. Elwell indicated that he was astounded to see the document. (*Id.* at 412)

Apparently in response to Mr. Elwell's testimony, GM, in its portion of the case, called Mr. Ivey to testify about the document he had written in 1973. Mr. Ivey testified in part as follows:

Q. Do you recall that anyone at General Motors asked you to prepare this paper?
A. No, to the best of my recollection, no-one asked me to do this.

(Vol. VIII of Trial Transcript at 1473)

Q. Was this, to your knowledge, ever sent to anyone in General Motors?
A. I don't believe it was ever sent to anyone. And I would have to say that because the conclusions are wrong and the assumptions are wrong. That's one of the reasons I don't think it was sent to anyone, because no-one ever talked to me about it. And, being a young engineer, if I made wrong assumptions and made faulty calculations and people saw it, I am absolutely sure someone would have talked to me about writing follow-up documentation or changing this before it got written. So I am just almost positive it was never sent to anyone, strictly because no-one ever talked to me about it.

(*Id.* at 1475)

Q. To your knowledge, has General Motors ever used this document that you wrote for any purpose at all?
A. No, I don't believe they have.

(*Id.* at 1476)

Counsel for GM argues that while attorneys may be required to disclose facts developed through interviews of employees, the underlying communications, i.e. their notes, are absolutely privileged, even if the notes are never communicated to their clients. (*See* Tr. of February 9, 1999 Hearing at 67–68) Under GM's theory, a waiver of the privilege can only occur if the crime-fraud exception is applicable. However, as will be discussed in the following section, crime-fraud is an extremely limited exception to the attorney-client privilege.

While GM did not initially raise the Ivey document as an issue, it has defended itself against the document and the inferences plaintiffs seek to draw at trial by making representations as to what Mr. Ivey, a GM employee, will testify to and by offering Mr. Ivey as a witness knowing that those representations and testimony are not fully consistent with what Mr. Ivey initially told GM's attorneys and subsequently testified to in depositions and by way of affidavit.

■ Early case law would have extended the attorney-client privilege in the corporate context only to communications between counsel and those management employees in the control group. Mr. Ivey would not have been included in that group and, thus, this issue would have been dealt with under the

14. Counsel, in a later question, used the date 1986, which was not corrected by the witness.

work product doctrine. Under the work product doctrine, the need for otherwise protected materials to use for impeachment purposes has been widely recognized. Courts have subsequently broadened the attorney-client privilege in the corporate context, but along with the expansion of the privilege comes the increased potential for abuse of the privilege. To use the attorney-client privilege to prevent the discovery and, if relevant, use of potentially impeaching material at trial which would have been available under work product doctrine analysis would be an abuse of the privilege. Consequently, "at issue" waiver must be available in the circumstances of this case to prevent potential abuses of the attorney-client privilege in the corporate context.

In circumstances similar to those presented to this Court, the United States District Court for the Southern District of New York did not hesitate to find that the attorney-client privilege had been waived. *See In re Southern and Eastern Dist. Asbestos Litigation,* 730 F.Supp. 582 (S.D.N.Y. 1990). In that case, the court was confronted with a claim of attorney-client privilege in connection with several documents. Pertinent to our case, is the court's analysis of the Spencer Memorandum. The Spencer Memorandum was a document which the court concluded appeared on its face to be privileged and which the court presumed had not been knowingly disclosed to third parties. *Id.* at 584. This memorandum was a lawyer's summary of responses made by Dr. Kenneth Smith on February 19, 1964 to various inquiries concerning the hazards of the defendant's insulation plant. The court found that the document makes clear that Dr. Smith, on defendant's behalf, conducted a thorough examination of the plant and had concluded that the cement operation, or any operation involving asbestos, would constitute an occupational hazard. *Id.* In 1982, the document and its contents became known to Robert Bockstahler. He was instructed by various lawyers that the document was cov-

ered by the attorney-client privilege and that he should never reveal its existence, let alone its contents. *Id.* Mr. Bockstahler was then designated by the defendant as a person to testify on its behalf in asbestos litigation. On each occasion, he testified that the company was not aware of the dangers precisely described by Dr. Smith. *Id.* The court concluded that a comparison of the memorandum and the witness' testimony suggested a number of disturbing possibilities, including that the company was unknowingly producing a sterilized witness; that the company was knowingly doing this; that the witness, and thus vicariously the company, was giving perjured testimony; or that the attorneys were shielding the document while allowing the witness to give inaccurate testimony. *Id.* at 585.

The *Asbestos Litigation* court found the privilege had been waived. The court concluded that shielding the document would distort the search for the truth and constituted a fraud upon the parties, the witness and the Court. *Id.* In discussing the potential for abuse, if waiver were not found, it did not appear that the court was addressing the crime-fraud exception. There was no indication that, at the time the allegedly privileged document had been created in 1964, it was to aid in the commission of a crime or a fraud. It was the defendant's later conduct that caused the court to conclude that the defendant had waived the privilege. It is for these same general reasons that this Court finds that GM's statements concerning Mr. Ivey and its use of him as a witness have resulted in a waiver of the privilege as to those documents containing notes of interviews with Mr. Ivey, i.e. documents 29, 30, 32, 210 and 213.[15] The Court does not find an implied waiver as to document 224, the deposition summary, or document 233, the document summary.

### 4. *Crime–Fraud Exception*

Originally, plaintiffs filed a motion for in camera review of certain documents. In set-

---

**15.** Defendant has indicated an intent to perhaps seek interlocutory review of the Court's decision finding certain documents are producible. Should defendant be successful in convincing the Eighth Circuit that the attorney-client privilege

has not been waived and that the notes at issue may not be discovered or used by plaintiffs, then the Court would consider excluding Mr. Ivey as a defense witness.

ting forth their basis for asking the Court to review the documents, plaintiffs noted that defendant claimed that the documents were subject to the attorney-client privilege and work product doctrine. While plaintiffs disputed the application of these privileges, they argued that if the Court were to agree with defendant that the documents were initially privileged, the Court should further find that the documents were subject to production under the crime-fraud exception. (Plaintiffs' Motion Requesting an in Camera Review of Document Nos. 233, 224, 216 and 1 Pertaining to Edward Ivey and the Cost Benefit Analysis Performed by Ivey at 6) This Court has now concluded that the facts contained in document 213 may not be shielded from disclosure under the work product doctrine as plaintiffs have demonstrated a substantial need for the information. Further, based on the "at issue" waiver doctrine, the Court has concluded that notes of interviews with Mr. Ivey along with the typed version of those notes, documents 213, 210, 29, 30 and 32, are subject to production. This Court has denied production of documents 233 and 224 for the reasons set forth above. Judge Stevens previously denied production of documents 210A, 216 and 1. Thus, the issue of whether the documents are producible under the crime-fraud exception is moot as to all of the documents, with the exception of documents 224, 233, 210A, 216 and 1.

However, prior to the time the case was reassigned to this division, the parties spent considerable time briefing the issue of the applicability of the crime-fraud exception. A prior mandamus action to the Eighth Circuit challenged the procedures adopted by the district judge in ruling on this motion. Moreover, the parties have again indicated that an interlocutory appeal may be filed in this case. Accordingly, in the interest of advancing the trial of this litigation, the Court will address the crime-fraud issues.

Following the mandamus action, the district court entered an order setting forth a three-part procedure[16] for determining whether the documents are protected by ei-

ther the attorney-client or work product privileges and, if so, whether the challenger has established by the necessary quantum of proof that the crime-fraud exception applies. (See August 31, 1998 Order (# 364)) Judge Stevens indicated that he did not intend to rule at the end of each of the three phases, but rather that he would hear all of the evidence prior to ruling on whether the documents are privileged or subject to the crime-fraud exception. Thereafter, the Court held three days of hearings on September 11, 14 and 15, 1998. Portions of the hearings were held in camera and ex parte while other portions were open proceedings in which plaintiffs' counsel participated. The parties differ significantly over the current status of those proceedings. Defendant takes the position that the district court has held only phase one and phase two hearings, while plaintiffs are of the view that the Court has completed its hearings on the crime-fraud issue. (See Tr. of February 9, 1999 hearing at 114, 117) The parties also disagree over the present status of the district court's original threshold determination that there had been a sufficient or threshold showing to justify an in camera review of the documents to ascertain whether the crime-fraud exception applies. The Eighth Circuit's mandamus order suggests that it would not be error to make a new and independent determination of this issue. See In re General Motors Corp., 153 F.3d 714, 716 n. 4 (8th Cir.1998), and the concurring opinion at 717. Judge Stevens' August 31, 1998 Order directed plaintiffs, during the second phase proceeding, to present all of the evidence on which they were relying to support the application of the crime-fraud exception. Judge Stevens' Order further advised: "[p]laintiffs shall keep in mind that the Court may exercise its discretion to revisit the threshold finding." (August 31, 1998 Order at 2)

Whether the Court revisits the threshold showing or, assuming the threshold showing has been made, examines the evidence from the standpoint of whether the application of

---

**16.** Pursuant to this procedure, GM, in the first phase, was to make a complete record establishing the privilege. During the second phase, plaintiffs were to present their case as to why the document, if privileged, fell within the crime-fraud exception. Finally, in phase three, GM was to present its case as to why the crime-fraud exception should not apply.

the crime-fraud exception has been established, the result will be the same. After reviewing all of the material that has been presented thus far, the undersigned concludes that the crime-fraud exception does not apply in the circumstances of this case. But for the Court's conclusion that plaintiffs have demonstrated a substantial need for the material under the work product doctrine and the finding of "at issue" waiver, documents 210, 213, 29, 30 and 32 would not be discoverable.

The Court's conclusion in this regard is based upon its understanding that the purpose of the crime-fraud exception is "to assure that the 'seal of secrecy,' ... between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime. *O'Rourke v. Darbishire*, [1920] A.C. 581, 604 (P.C.)." *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). The Eighth Circuit has required as part of the threshold showing that a specific document providing legal advice be made in furtherance of the alleged fraud or closely related to it. *See Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 566 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998). In *Pritchard–Keang Nam Corp. v. Jaworski*, 751 F.2d 277, 281 (8th Cir.1984), *cert. dismissed*, 472 U.S. 1022, 105 S.Ct. 3491, 87 L.Ed.2d 625 (1985), the Eighth Circuit concluded that timing was critical and that there must be some showing that the " 'client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme.' *In re Murphy*, 560 F.2d 326, 338 (8th Cir.1977)." Likewise, the Missouri Supreme Court has reached the same conclusion as the Eighth Circuit on the timing issue, citing the *Pritchard–Keang Nam Corp.* case with approval. *See State ex rel. Peabody Coal Co. v. Clark*, 863 S.W.2d 604, 608 (1993) (prima facia showing requires that client engaged in or was planning criminal or fraudulent scheme when he sought advice of counsel to further scheme).[17]

Significantly, the Eighth Circuit, in the *Pritchard–Keang Nam Corp.* case, noted its disagreement with the comments made by the United States Circuit Court for the District of Columbia in *In re Sealed Case*, 676 F.2d 793 (D.C.Cir.1982), wherein the court suggested that if a client actually commits a crime or attempts a crime or fraud following receipt of the benefit of counsel's work product, the material may be subject to production. *See Pritchard–Keang Nam Corp.*, 751 F.2d at 283 n. 5. The Eighth Circuit went on to state that the case law did not support this statement and that the two other judges on the panel in *In re Sealed Case* did not join in this portion of the opinion. *Id.* The Eighth Circuit noted that the fact that a fraud follows an attorney-client communication is not enough to satisfy the crime-fraud exception. The crime or fraud must have been the objective of the client's communication. *Id.*

The requirement that the fraud or crime have been the objective of the communication is the basis for this Court's conclusion that the crime-fraud exception does not apply in the circumstances of this case. The majority of the argument advanced by plaintiff in support of the crime or the fraud relate to testimony that the witness, Mr. Ivey, gave in depositions in 1984 and thereafter. In addition, counsel argues that in this case in 1993, Mr. Ivey, for the first time, changed his prior testimony that he did not recall certain things and testified to specifically recalling certain events. The documents at issue involve notes of interviews given by Mr. Ivey. There is no claim by plaintiffs that Mr. Ivey was untruthful in these interviews. To the contrary, plaintiffs would seek to revive Mr. Ivey's memory with these documents. During argument, counsel for plaintiffs offered the last paragraph of document 210 as evidence of the offered criminal or fraudulent advice. (Tr. of February 9, 1999 Hearing at 90–92) In that document, Mr. Howard, after summarizing his interview with Mr. Ivey, stated:

17. The *Peabody Coal Co.* court left open the question of whether Missouri law recognizes a crime-fraud exception to the attorney-client privilege in civil cases. However, the court concluded that existing precedent provided the appropriate framework for analyzing the claim.

Obviously, Ivey is not an individual whom we would ever, in any conceivable situation, want to be identified to the Plaintiffs in a PCFFF case and the documents he generated are undoubtedly some of the potentially most harmful and most damaging were they ever to be produced.

(Doc. 210 at 7) In discussing their contention that this statement amounts to offered advise amounting to the commission of a crime, fraud or other misconduct, counsel states: "if they are asked point blank in interrogatories and he's not identified, this is certainly sworn testimony that would be perjurious." (Tr. of February 9, 1999 Hearing at 93) When asked if this had happened, counsel stated that he did not know if it had happened, but all that was required was that advice for the commission of future misconduct be offered. (*Id.*) The Court does not accept this theory. Further, this statement, assuming it can even be considered as to the threshold showing, has many different meanings that would fall short of a crime, for example, do not *voluntarily* produce this witness as someone knowledgeable in the field. Plaintiffs claim that document 210, the typed notes of Mr. Howard's interview of Mr. Ivey in 1981, establishes that Mr. Ivey had a sudden loss of memory and that the fraudulent conduct began in 1981 and continued through February of 1998. (Plaintiffs' Brief on Sanctions (doc # 398) at 9–10) No document from 1981 or 1983 demonstrates a sudden loss of memory. The earliest evidence presented by plaintiffs of Mr. Ivey's alleged memory loss came in September of 1984 in the *Burton* case, three years after the 1981 interview and one year after the August 1983 interview. (Plaintiffs' Hearing Brief re: Ivey Value Analysis at 4 and Exh. 6 at 1 (doc # 378)) Plaintiffs also contend that before GM could conceal the facts, it had to determine what the facts were and who had possession of them. (Plaintiffs' Response to Defendant General Motors Corporation's Memorandum of Law Regarding GM's Proposed Findings of Fact and Conclusions of Law Related to the Crime–Fraud Hearing at 13 (doe # 405)) Under *Pritchard–Keang Nam Corp.*, this claim is, on its face, insufficient to support a crime-fraud claim.

Further, plaintiffs' real complaints involve Mr. Ivey's 1993 testimony in this Court and the conduct of counsel in allowing such testimony which was contrary to his earlier deposition testimony, as well as the interview notes. These claims about conduct some twenty years after the creation of the Ivey Analysis and twelve years after the 1981 interview are not evidence of a crime at the time the facts were gathered by counsel in 1981 and 1983. Moreover, the asserted conduct in this case is not that Mr. Ivey was not identified, the crime which plaintiffs claim document 210 evidences, but that Mr. Ivey's memory was somehow affected by various meetings between Mr. Ivey and defense counsel. None of these documents recording Mr. Ivey's recollections contain any indication that counsel was directing the witness to provide untrue answers or that Mr. Ivey was seeking counsel on how to answer the questions. Other courts have concluded that the documents at issue are insufficient to support the application of the crime-fraud exception. *See Jones v. General Motors Corp.*, 24 F.Supp.2d 1335, 1339 (M.D.Fla.1998) (language in document entitled "Interview With Edward C. Ivey, November 3, 1981" is insufficient to vitiate attorney-client privilege). The documents and the conduct cited by plaintiffs, while raising many troubling questions, fall far short of even suggesting that the actual interviews themselves were for the purpose of soliciting or giving advice on the commission of a crime or fraud, i.e. perjury or obstruction of justice.

As to the other documents, document 224, the 1991 summary of a deposition in *Moseley;* document 233, the summary of various documents; document 210A, summaries of witness interviews not at issue in this case; document 216, the summary of a deposition in *Jampole;* and document 1, an attorney's analysis of Ron Elwell's testimony in various cases, there has been no argument that would support even a threshold claim that the crime-fraud exception applies to these documents.

### III. *MOTION FOR SANCTIONS*

On April 8, 1998, plaintiffs filed a Motion for Sanctions Against Defendant General Motors Corporation Regarding Edward C. Ivey and Newly Discovered Evi-

dence. The basis for the motion is plaintiffs' belief that GM presented a witness at the first trial with knowledge that Mr. Ivey's testimony was false. (Motion at 1) In particular, plaintiffs allege that Mr. Ivey's testimony that no one asked him to prepare the Ivey Analysis, that he never sent it to anyone at GM and that he did it on his own was directly contrary to facts conveyed by Mr. Ivey to counsel for GM during interviews in 1981 and 1983. (*Id.* at 7) Plaintiffs sought the following relief:

1. That Edward Ivey, Maynard Timm, William Kemp and W. Richard Davis be required to appear at a hearing before the Court to testify concerning their respective knowledge of the Ivey documents and Ivey's testimony at the first trial.

2. After hearing the evidence the Court make factual findings that: (a) Ivey testified falsely on August 18, 1993; (b) GM knew that Ivey testified falsely on August 18, 1993; and (c) GM obstructed justice in this case.

3. The Court strike GM's answer.

4. As an alternative to striking GM's answer, plaintiffs propose: (a) the Court strike GM's exhibits and experts; (b) the Court instruct the jury concerning GM's knowledge of Ivey's false testimony, GM's fabrication of evidence and GM's obstruction of justice; and (c) the Court order the Ivey Analysis, the 1981 Ivey interview and other relevant documents which the Court orders produced to plaintiffs be admissible at trial.

5. The Court order GM to produce a privilege log setting forth all documents which discuss or refer to Ivey or the Ivey Analysis.

6. The Court enter an appropriate, but substantial monetary sanction against GM.

7. The Court order such further relief as the Court deems just and proper.

(*Id.* at 25–26)

Some of the relief requested has already been granted. For example, hearings were held at which time Edward Ivey, David Graves, William Kemp, Phillip Holladay, Maynard Timm, and W. Richard Davis all testified concerning the Ivey Analysis. On July 1, 1998, the Court ordered that a privilege log be produced and on October 2, 1998, the Court ordered that an updated privilege log be produced including those documents submitted to the Court during the ex parte proceedings. Further, as part of this Order, defendant has been directed to produce certain documents.

On February 9, 1999, plaintiffs' counsel argued that the sanctions sought were those reiterated in the first seven paragraphs, beginning at page 18, of Plaintiffs' Proposed Findings of Fact and Conclusions of Law filed on October 26, 1998. (Tr. at 128–129) The Court has reviewed those requests and finds that they are generally those sanctions described by the Court in paragraphs 2, 3 and 4, above. In response to the Court's questions, plaintiffs' counsel confirmed that the requested sanction was for all exhibits, witnesses and experts to be stricken, not just those that relate to the Ivey analysis. (Tr. at 130) While initially indicating that they were not requesting monetary sanctions, plaintiffs' counsel later indicated that they were not withdrawing their request for monetary sanctions. (Tr. at 132–133)

Plaintiffs have requested sanctions pursuant to the Court's inherent power as recognized by the Supreme Court in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). (*See* Plaintiffs' Motion for Sanctions Against Defendant General Motors Corporation Regarding Edward C. Ivey and Newly Discovered Evidence at 3) Plaintiffs also request sanctions pursuant to Rule 37(d),[18] arguing that GM's misconduct regarding Ivey is tantamount to spoliation of evidence and that GM failed to properly respond to Request No. 40 of plaintiffs' second request for production of documents. (*Id.* at 19–23) Defendant opposes the motion for sanctions primarily on the basis that it has engaged in no sanctionable conduct.

The issue presented to the Court is whether discrepancies in a witness' testimony

---

18. Rule 37(d) does not apply because GM filed a response to plaintiffs' document request. To the extent that plaintiffs were dissatisfied with GM's response, the proper procedure would have been to seek a Court order to compel, rather than to seek sanctions.

amount to sanctionable conduct or whether this conduct is more properly the subject of impeachment at trial. The Court questions whether any relief beyond what has been ordered, that is, in camera testimony, preparation of privilege logs and production of certain documents, should be granted. However, the Court will defer the issue of whether monetary sanctions are appropriate until the conclusion of the trial.

Plaintiffs' request that the Court strike GM's answer or, in the alternative, that the Court strike GM's exhibits, experts and witnesses will be denied. During the first appeal, the Eighth Circuit emphasized the strong policy favoring trial on the merits and against depriving a party of his day in court. *See Baker v. General Motors Corp.*, 86 F.3d 811, 817 (8th Cir.1996), *rev'd on other grounds*, 522 U.S. 222, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998). The Eighth Circuit's discussion of the sanction issue in the earlier appeal in this case is entitled to considerable weight even though that ruling was made in the context of a motion for sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure, rather than the Court's inherent powers. The Eighth Circuit, in the appeal from the first trial in this case, noted that even after a court determines that the imposition of Rule 37 sanctions is appropriate, the court must still determine whether the sanction is just and specifically related to the claim at issue in the discovery order. Significantly, the Eighth Circuit was critical of the sanctions imposed by the district court on the discovery issues because the sanction was not specifically related to the claim at issue in the discovery order. *Baker*, 86 F.3d at 817.

In this case, the Ivey Analysis was introduced at the first trial on the issue of aggravated damages. This document would appears to be unrelated to the underlying issue of whether the design in this case was defective. Even if plaintiffs' claims of obstruction of justice and subornation of perjury had a stronger factual basis than has been currently developed, the sanction sought is unrelated to the document at issue. Accordingly, plaintiffs are not entitled to have GM's answer, exhibit and witness lists or experts stricken.

Further, plaintiffs' request that the jury be instructed that the witness committed perjury or testified falsely is also denied. If the Ivey Analysis is introduced into evidence, the jury will be allowed to make their own assessment of the witness' credibility based upon all properly admissible and relevant evidence.

## IV. *CONCLUSION*

Based on the foregoing, it is

ORDERED that Plaintiffs' Motion for Sanctions Against General Motors Regarding Edward Ivey and Newly Discovered Evidence (doc # 226) is granted to the extent the Court has ordered witnesses to appear and testify, ordered preparation of a privilege log and ordered production of certain documents. That portion of the motion seeking to strike GM's answer, exhibit and witness lists and experts is denied. That portion of the motion seeking factual findings by the Court is denied. The request for monetary sanctions is deferred until the conclusion of the trial. It is further

ORDERED that Plaintiffs' Motion for in Camera Review of Document Numbers 233, 224, 216 and 1 Pertaining to Edward Ivey (doc # 224) is granted in part and denied in part. The motion is granted to the extent the Court has ordered an in camera review of documents 233, 224, 216 and 1, along with other documents. The accompanying request for production is denied as to documents 233, 224, 216 and 1. The supplemental oral request for production of documents 29, 30, 32, 210 and 213 is granted as to all facts contained in the documents. Defendant shall have until Wednesday, February 24, 1999, in which to propose redactions of attorneys' mental impressions from documents ordered discoverable by this Order. It is further

ORDERED that Plaintiffs' Motion for in Camera Review of Handwritten Notes of William Cichowski Made on August 29, 1984 (doc # 233) is granted. It is further ordered that plaintiffs' accompanying request for the production of these notes is granted.